MARTIN A. MUCKLEROY
**MUCKLEROY LUNT, LLC**
Nevada Bar No.: 009634
6077 S. Fort Apache Rd., Ste. 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Fax: (702) 938-4065
martin@muckleroylunt.com

TODD MCCLELLAND
JENNIFER S. CZEISLER
EDWARD W. CIOLKO
CHRISTOPHER HURLD
**STERLINGTON, PLLC**
228 Park Avenue South, Suite 97956,
New York, New York 10003
(212) 433-2993 Tel.:
todd.mcclelland@sterlingtonlaw.com
jen.czeisler@sterlingtonlaw.com
edward.ciolko@sterlingtonlaw.com
christopher.hurld@sterlingtonlaw.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ALEKSANDER DJORDJEVIC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PLANET 13 HOLDINGS INC. and IDSCAN.NET, INC.,<br><br>Defendants. | Case No. ____________________<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Aleksander Djordjevic ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Planet 13 Holdings Inc.

and IDScan.net, Inc., and alleges as follows upon personal knowledge as to Plaintiff's own acts and experiences, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. To buy cannabis in Nevada a customer must hand over a government-issued identification document. Nevada requires it. What Nevada does not require is what Defendant Planet 13 Holdings Inc. ("Planet 13") did with the document once it had it.

2. Nevada law obliges a cannabis establishment, before selling to a consumer, to "verify the age of the consumer by checking a government-issued identification that contains a photograph of the consumer using an identification scanner which has been approved by an appropriate agent of the Board."[1] The purpose the statute authorizes is the verification of age. Nevada law separately provides that the Cannabis Compliance Board's regulations "must not require a consumer to provide an adult-use cannabis retail store with personally identifiable information other than government-issued identification to determine the age of the consumer."[2]

3. Planet 13 went further and said so. In a case study published with its participation, Planet 13's identity vendor wrote: "Although the Nevada Cannabis Control Board *requires* digital ID scanning, Planet 13 takes it to the next level, with powerful authentication at each of their 16 Las Vegas check-in stations."[3]

---

[1] Nev. Rev. Stat. § 678B.545, enacted by A.B. 342, ch. 156, 2023 Nev. Stat. 835 (approved June 1, 2023; operative Jan. 1, 2024).

[2] Nev. Rev. Stat. § 678D.500.

IDScan.net, Planet 13 Sets the Standard for Dispensary Age Verification (Aug. 2022), https://idscan.net/case-study/the-worlds-largest-cannabis-dispensary-sets-a-high-standard-for-age-verification-fake-id-detection/ (no longer publicly available), archived at Internet Archive, Wayback Machine, https://web.archive.org/web/20260902144605/https://idscan.net/case-study/the-worlds-largest-cannabis-dispensary-sets-a-high-standard-for-age-verification-fake-id-

4. "Next level" meant photography. The same case study states that Planet 13's "[a]uthentication goes beyond just ID scanning, and means that every ID is photographed using white light, UV light, and infrared light . . . ."[4]

5. It also meant retention, aggregation, and profiling. "All Planet 13 scanners sync with their centralized visitor management system (VMS), VeriScan Online Enterprise."[5] And the purpose for the scanning was not only compliance. A statement announcing Planet 13's implementation and use of ID scanners and VeriScan described that VeriScan's parsing of the identification documents "allows Planet 13 to seamlessly harvest the names and demographic/geographic information of its guests," that "[t]his data is providing insights into customer profiles," and that the technology "provide[s] data that is incredibly valuable for marketing and operations."[6]

6. Defendant IDScan.net, Inc. ("IDScan") is the vendor that supplied that system. IDScan scanners, VeriScan, and other technology has been implemented and is used at Planet 13's Las Vegas SuperStore location and, on information and belief, its other locations.

---

detection/ (archived September 2, 2026; last visited Sept. 22, 2026). A copy of the case study recovered from the Internet Archive's Wayback Machine is attached as Exhibit 1. The quoted language appears at Ex. 1 at 2.

[4] *Id., Ex. 1 at 2.*

[5] *Id., Ex. 1 at 3.*

[6] Press Release, IDScan.net, World's Largest Cannabis Dispensary Planet 13 Partners with IDScan.net for ID Verification (Aug. 4, 2022), https://www.prweb.com/releases/world-s-largest-cannabis-dispensary-planet-13-partners-with-idscan-net-for-id-verification-867323713.html (last visited Sept. 9, 2026).

7. IDScan claims that its products perform more than 21 million identity verifications every month at more than 20,000 locations worldwide.[7]

8. On September 1, 2026, veteran cybersecurity journalist and researcher Brian Krebs reported that digital scans of more than 153 million United States and Canadian driver's licenses had been placed for sale on a dark web marketplace operating under the name "Nexus," together with more than 10 million identification cards, more than three million travel documents and international identification documents, and at least 579,000 medical cards. The operators of Nexus stated that they had been "continuously exfiltrating new data for over a year."[8]

9. The records offered for sale were photographs. A typical record contained six image files: three pairs of front and back photographs of the identification document including a basic image scan, and infrared and ultraviolet versions of the same images, each carrying an appended date and time stamp.[9] Those are the three light spectra in which Planet 13's scanners photographed every identification document presented at its check-in stations.

10. On September 1, 2026, the New Orleans field office of the Federal Bureau of Investigation opened an official investigation into an apparent breach involving IDScan.[10]

11. According to Brian Krebs, Zach Edwards, another prominent security and privacy researcher, located his identification document on the Nexus marketplace.[11] Mr. Edwards's

---

[7] IDScan.net, *The Fictitious Pickup Boom: How Fake Drivers Steal Freight* (Aug. 6, 2026), https://idscan.net/press-release/the-fictitious-pickup-boom-how-fake-drivers-steal-freight/ (last visited Sept. 18, 2026); *see also* KrebsOnSecurity, FBI Probes Service Selling 153M+ Drivers Licenses (Sept. 1, 2026), https://krebsonsecurity.com/2026/09/fbi-probes-service-selling-153m-drivers-licenses/ (last visited Sept. 9, 2026) (reporting IDScan.net's published figures).

[8] KrebsOnSecurity, *supra* note 7.

[9] *Id.*

[10] *Id.*

[11] *Id.*

documents on Nexus included a time stamp corresponding to a trip to Las Vegas. He had handed his identification document to three businesses on that trip. The only one that he was certain had scanned it in a device was Planet 13.[12]

12. On September 4, 2026, IDScan published a data breach notice on its website stating that "an unauthorized third party may have accessed and/or copied certain customer information stored within their accounts on the IDScan.net cloud," that the affected data "may include full names and driver's license or other government-issued identification numbers," and — in a sentence that concedes the existence of the marketplace — that "full access to the information required payment."[13] Although IDScan posted a notice acknowledging the breach on its website, it configured the notice with a "noindex" directive instructing search engines not to include the page in search results, thereby materially reducing the likelihood that affected consumers would discover the notice through an ordinary Internet search.

13. Planet 13 has said nothing publicly about the Data Breach.[14] It has published no notice on its website, issued no press release, and made no filing with the United States Securities

---

[12] *Id.*

[13] IDScan.net, Notification of Data Security Incident (Sept. 4, 2026), https://idscan.net/notification-data-security-incident/ (last visited Sept. 9, 2026).

[14] As used herein, "Data Breach" means the cybersecurity incident or related series of incidents alleged herein through which one or more unauthorized third parties accessed, acquired, copied, or exfiltrated Private Information stored within customer accounts on the IDScan.net cloud, including Private Information collected from Plaintiff and Class Members through Planet 13's use of IDScan's systems. The Data Breach includes the alleged continuing exfiltration of Private Information over a period exceeding one year and the resulting transfer, indexing, previewing, disclosure, and availability for purchase of that information through the Nexus criminal marketplace. The term encompasses all related unauthorized access, acquisition, copying,

and Exchange Commission concerning the incident, including no current report under Item 1.05 of Form 8-K, the item prescribed for material cybersecurity incidents. On information and belief, it has given no individual notice to Plaintiff or Class Members and has offered them no credit monitoring, identity protection or insurance of its own.

14. Planet 13 knew the risks and represented that it guarded against them. It acknowledged that it "may store and collect personal information about customers," that it was "responsible for protecting that information from privacy breaches," and that theft of customer data was an "ongoing risk."[15] It further told investors that it conducted "thorough assessments of all third-party providers before engagement" and maintained "ongoing monitoring to ensure compliance with [its] cybersecurity standards."[16]

15. A stolen payment card can be canceled in a telephone call. A driver's license cannot. It carries the holder's full legal name, date of birth, driver's license number, residential address, physical description, signature, photograph, and document number, and it remains valid for years. The infrared and ultraviolet images make matters worse rather than better: those images exist to prove that a document is genuine, and in a criminal's hands they are a template for producing counterfeits capable of defeating the very authentication they were captured to perform.

16. The exposure is not evenly distributed. Cannabis remains unlawful under federal law. A record establishing that a named, photographed individual entered a cannabis dispensary on a particular date carries consequences — for employment, for professional licensing, for

---

exfiltration, disclosure, dissemination, and continuing possession or circulation of the Private Information, whether accomplished through a single intrusion or multiple related events and regardless of the precise means of access or the identity of the persons responsible.

[15] *See* Planet 13 Holdings Inc., Annual Report (Form 10-K), at 47, 58 (2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001813452/d27263a1-ccd2-455c-81b0-54e7cd18ba61.pdf (Items 1A and 1C).

[16] *Id.*

immigration status, for firearms eligibility, for child custody, and for anyone whose safety depends on their residential address remaining unknown — that a stolen credit card number does not.

17. Plaintiff brings this action on behalf of a nationwide class and state subclasses for negligence, breach of implied contract, breach of third-party beneficiary contract, unjust enrichment, violation of the Nevada consumer fraud statute, and declaratory relief, and seeks damages, restitution and injunctive relief compelling Defendants to secure and to delete the identification documents they took.

## PARTIES

18. Plaintiff Aleksander Djordjevic is a natural person and a citizen of the State of Florida, residing in Orange County, Florida.

19. On or about December 20, 2025, Plaintiff presented a government-issued identification document at a check-in station of the Planet 13 location at 4850 W. Sunset Rd., Las Vegas, Nevada in order to enter and to purchase cannabis products. A Planet 13 employee placed the document into a scanning device.

20. Plaintiff is not, and at the time of that visit was not, enrolled in the Planet 13 rewards program and had no Planet 13 online account.

21. Defendant Planet 13 Holdings Inc. is a corporation organized under the laws of the State of Nevada with its principal executive offices at 2548 West Desert Inn Road, Suite 100, Las Vegas, Nevada 89109. Its common stock trades on the Canadian Securities Exchange under the symbol "PLTH" and is quoted on the OTCQX Market under the symbol "PLNH."[17]

22. On July 26, 2026, Planet 13 entered into an Agreement and Plan of Merger with Vireo Growth Inc., a British Columbia corporation, and Supernova Merger Sub Inc., a Nevada corporation and a wholly owned subsidiary of Vireo, under which Merger Sub would merge with and into Planet 13 and "the Company shall continue as the surviving corporation of the Merger

[17] Planet 13 Holdings Inc., Annual Report (Form 10-K) (fiscal year ended Dec. 31, 2025) (filed Mar. 25, 2026) (cover page and Item 5).

and a direct wholly owned Subsidiary of Parent."[18] That merger has not closed. Vireo has not filed the contemplated registration statement on Form S-4, the effectiveness of which is a condition to closing, Planet 13's stockholders have not voted, and the agreement may be terminated if the merger is not consummated by July 26, 2027, provided that either party may extend that deadline to October 26, 2027, by timely written notice if the only unsatisfied closing conditions are specified conditions concerning cannabis regulatory consents.[19] Planet 13 remains a distinct corporation and is sued as such. Plaintiff reserves the right to seek leave to add Vireo Growth Inc. as a defendant if the merger closes and the facts and applicable law provide a basis for doing so. In the Merger Agreement, "the Company" is Planet 13 Holdings Inc. and "Parent" is Vireo Growth Inc.

---

[18] Agreement and Plan of Merger, dated as of July 26, 2026, among Vireo Growth Inc., Supernova Merger Sub Inc. and Planet 13 Holdings Inc., § 1.1, filed as Exhibit 2.1 to Vireo Growth Inc., Current Report (Form 8-K) (July 30, 2026).

[19] *Id.* §§ 5.3(a)-(b), 6.1(a)–(b), 7.1(b)(i). As of September 18, 2026, Vireo had not publicly filed the contemplated Form S-4, and Planet 13 had not publicly reported a stockholder vote on the merger.

23. Defendant IDScan.net, Inc. is a corporation organized under the laws of the State of Delaware, incorporated on January 1, 2021, with its principal place of business at 2045 Lakeshore Drive, Suite 526, New Orleans, Louisiana 70122.[20]

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), because this is a class action in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are 100 or more members of the proposed Class, and at least one member of the proposed Class is a citizen of a State different from that of at least one Defendant.

25. This Court has general personal jurisdiction over Planet 13 because it is incorporated in the State of Nevada and maintains its principal place of business in this District.

26. This Court has specific personal jurisdiction over IDScan because it purposefully directed its activities at the State of Nevada by contracting to supply, and supplying, the identity scanning system deployed at Planet 13's Nevada dispensaries, by receiving and storing in its cloud the identification documents scanned there, and by marketing that deployment publicly; and the claims asserted here arise out of and relate to that conduct.

27. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and § 1391(c)(2) because Planet 13 resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

---

[20] Statement and Designation by Foreign Corporation of IDScan.net, Inc., Cal. Sec'y of State File No. B20250003635 (filed Mar. 20, 2025), and Certificate of Good Standing of IDScan.net, Inc., Del. Sec'y of State (Mar. 18, 2025) (certifying incorporation in Delaware on Jan. 1, 2021), attached thereto.

# FACTUAL ALLEGATIONS

## A. Planet 13 Requires Customers to Present Government-Issued Identification Credentials at Entry

28. Planet 13 is a vertically integrated cannabis company. It describes itself as operating "award-winning cultivation, production and dispensary operations across its locations in Nevada, Illinois, and Florida," and as being home to "the nation's largest dispensary, located just off The Strip in Las Vegas."[21]

29. The Planet 13 Las Vegas SuperStore opened on November 1, 2018. Planet 13 states that it comprises approximately 23,000 square feet of retail space within a 100,000 square foot entertainment complex adjacent to the Las Vegas Strip, and that it "has the capacity to serve between 3,000 and 5,000 customers per day."[22]

30. As of December 31, 2025, Planet 13 operated 33 medical dispensaries in Florida "encompass[ing] over 80,000 square feet of retail space," two dispensary licenses in Nevada, and one dispensary in Illinois.[23] It states that it has "a customer-loyalty database of over 485,000 customers."[24]

31. Every cannabis transaction at Planet 13 requires identity and eligibility verification using a government-issued identification credential. According to Planet 13, its Florida locations

---

[21] Press Release, Planet 13 Holdings Inc., Second Quarter 2026 Financial Results (Aug. 12, 2026), filed as Exhibit 99.1 to Current Report (Form 8-K) (Aug. 12, 2026).

[22] *See* Planet 13 Holdings Inc., Annual Report (Form 10-K), *supra* note 15 (Items 1 and 2).

[23] *Id.* (Items 1 and 2).

[24] *Id.* (Items 1 and 2).

require consumers to present their medical card and ID before entering.[25] Planet 13 states that consumers at its Las Vegas and Illinois locations must present their ID when entering the location.[26] According to Planet 13, the ID presented at Las Vegas and Illinois locations must be a "[v]alid government-issued photo ID (21+), NOT expired."[27] Planet 13 requires purchasers at its Florida locations to present "[v]alid (non-expired) Florida Medical Marijuana Card and valid government-issued photo ID."[28]

32. Planet 13 scanned customer IDs at its Las Vegas SuperStore location throughout the Class Period using IDScan scanners, VeriScan, and other technology. On information and belief, Planet 13 scanned customer IDs and medical marijuana cards at its other locations during the Class Period using IDScan scanners, VeriScan, and other technology.

**B. Nevada Law Permits Planet 13 to Verify Age and Nothing More; It Does Not Authorize Retaining or Monetizing the Document**

33. Since January 1, 2024, Nevada has required by statute that a cannabis establishment agent, before selling cannabis or a cannabis product to a consumer, "verify the age of the consumer by checking a government-issued identification that contains a photograph of the consumer using an identification scanner which has been approved by an appropriate agent of the Board to determine the validity of any government-issued identification."[29] The Cannabis Compliance Board's regulation, which imposed the same requirement throughout the Class Period, requires the

---

[25] Planet 13, *FAQ: How Does the Check-In and Purchase Process Work?*, https://planet13.com/frequently-asked-questions/how-does-the-check-in-and-purchase-process-work/ (last visited Sept. 20, 2026).

[26] *Id.*

[27] Planet 13, *FAQ, What do I Need to Bring to Check In?*, https://planet13.com/frequently-asked-questions/what-do-i-need-to-bring-to-check-in/ (last visited Sept. 20, 2026).

[28] *Id.*

[29] Nev. Rev. Stat. § 678B.545.

agent to record, in the inventory control system, the amount of cannabis or cannabis product sold, the date and time of sale, the agent's registration card number and the establishment's license number.[30] It does not require the retention of the identification document, an image of it, or the customer's identity.

34. Nevada law limits the information that may be collected from the consumer. NRS 678D.500 provides that the Board's regulations "must not require a consumer to provide an adult-use cannabis retail store with personally identifiable information other than government-issued identification to determine the age of the consumer."[31] The authorized purpose is the determination of age.

35. No provision of Nevada law required Planet 13 to photograph each identification document under white, ultraviolet, and infrared light; to retain those photographs; to transmit them to a vendor's cloud; to synchronize them across stores into a central database; or to mine them for marketing. Planet 13 did each of those things, and it and IDScan described doing so in public.

### C. Planet 13 Implemented IDScan's VeriScan System, Which Photographs Identification Documents Under Three Light Spectra, Retains Them Indefinitely in IDScan's Cloud and Mines Them for Marketing

36. On August 4, 2022, IDScan issued a press release, with Planet 13's participation and a quotation from Planet 13's Vice President of Sales and Marketing, describing Planet 13's deployment of IDScan's technology. A companion case study was published at the same time.[32]

37. The press release states: "Planet 13 uses IDScan.net solutions to read physical and digital copies of government issued IDs, including passports. ID scanners are placed at each of its

---

[30] Nev. Cannabis Compliance Regs. § 7.015, recodified as Nev. Admin. Code § 678B.303.

[31] Nev. Rev. Stat. § 678D.500.

[32] *See* Press Release, IDScan.net, *supra* note 6.

Las Vegas SuperStore dispensary's 16 check-in stations, and they sync with a centralized visitor management system – VeriScan Online Enterprise."[33]

38. VeriScan Online Enterprise is IDScan's cloud product. IDScan describes it as "[p]owerful cloud-based software for ID scanning and identity verification," and, under the heading "Capture images," states that "[s]aving images from a scanned ID will help your team better recall your loyal customers." Among its listed features are the ability to "[s]ync multiple devices to a centralized cloud portal" and to "[s]ave ID photos to visitor profiles for easy visual recall."[34]

39. IDScan's support documentation defines what that cloud stores. "Images refers to cropped ID photo and live photos taken by webcam at time of scan." "Attachments refers to high-resolution scans of the front and back of the ID, as well as any agreements or reports related to the history record."[35]

40. IDScan states that the default configuration collects and retains everything: "By default, new accounts are set to 'Collect all,'" and "[t]he default setting for new customers is to retain all records in our secure cloud." On IDScan's Basic plan the default cannot be changed at all, and the ability to purge personal information after a set period is limited to its Enterprise and ID Authentication plans.[36]

---

[33] *Id.*

[34] IDScan.net, VeriScan — Age Verification & Visitor Management Software, https://idscan.net/veriscan-age-verification-visitor-management-software/ (last visited Sept. 9, 2026).

[35] IDScan.net Support, VeriScan Cloud Portal — Data Collection and Retention, https://support.idscan.net/veriscan-cloud-portal/data-collection-and-retention (last visited Sept. 9, 2026).

[36] *Id.*

41. The case study describes the imaging. "Authentication goes beyond just ID scanning, and means that every ID is photographed using white light, UV light, and infrared light - giving the highest degree of confidence in ID authenticity."[37] It identifies the hardware as the Thales AT10K, chosen because "AT10K scanners can scan both drivers' licenses and passports - critical for Planet 13's operations in key tourist markets."[38] IDScan markets that device as performing "[u]ltraviolet and infrared scanning of both IDs and passports."[39]

42. The case study describes the centralization: "All Planet 13 scanners sync with their centralized visitor management system (VMS), VeriScan Online Enterprise," and "[b]ecause all Planet 13 scanners sync to a central database, banned patrons are immediately flagged at all entry-points."[40]

43. And it describes the secondary use. "In addition to scanning and verification, VeriScan performs ID parsing, which takes fields stored in the barcode and converts them to readable data. This allows Planet 13 to easily collect names and demographic/geographic information about all of their guests."[41] The press release puts it more plainly: the parsing "allows Planet 13 to seamlessly harvest the names and demographic/geographic information of its guests," and "[t]his data is providing insights into customer profiles, which is especially valuable as Planet 13 expands its footprint into other states."[42]

---

[37] *See* IDScan.net, Planet 13 Case Study, *supra note 3, Ex. 1 at* 2.

[38] *Id., Ex. 1 at 4.*

[39] IDScan.net, Thales AT10K, https://idscan.net/product/thales-at10k-full-page-passport-document-reader-550-dpi-uv-rfid-cn-pv70-02-02-00-01-new/ (last visited Sept. 9, 2026).

[40] *See* IDScan.net, Planet 13 Case Study, *supra note 3, Ex. 1 at* 3.

[41] *Id., Ex. 1 at 3.*

[42] *See* Press Release, IDScan.net, *supra* note 6.

44. IDScan's chief executive was quoted in the same release: "Beyond compliance, our solutions enhance guest experience and provide data that is incredibly valuable for marketing and operations."[43]

45. Contemporaneous reporting further described VeriScan Online Enterprise as "AI-powered."[44]

46. Planet 13 therefore did not merely collect and retain identification documents for age verification; it subjected the images and personal information extracted from those documents to AI-enabled extraction, classification, and analysis, transforming information obtained as a condition of entry into customer profiles and commercial intelligence used for marketing, operations, store design, and expansion.[45]

47. On information and belief, Planet 13 continued to use IDScan's identity scanning system at its dispensaries from 2022 until at least the date of the Data Breach.

**D. More Than 153 Million Identification Documents Were Exfiltrated From IDScan's Cloud Over More Than a Year and Offered for Sale on a Criminal Marketplace**

48. On or about August 31, 2026, a user of a Russian cybercrime forum alerted veteran cybersecurity journalist and researcher Brian Krebs to a service advertised on the forum offering access to digital scans of identity documents belonging to more than 170 million people in North America.[46] The service, called "Nexus," claimed to hold more than 153 million driver's licenses

---

[43] *Id.*

[44] Dorothy Crouch, *Planet 13 Adopts AI ID Verification for Cannabis Dispensary Security and Compliance*, Retail TouchPoints (Aug. 12, 2022), https://www.retailtouchpoints.com/news/planet-13-adopts-ai-id-verification-for-cannabis-dispensary-security-and-compliance/114592/.

[45] *See id.*

[46] *See* KrebsOnSecurity, *supra* note 7.

from the United States and Canada, more than 10 million identification cards, more than three million travel or international identification documents, and at least 579,000 medical cards.[47]

49. The records in Nexus were reportedly not stolen in a single incident. Rather, Nexus operators stated: "We have been continuously exfiltrating new data for over a year into our private database."[48] In the twenty-four hours after the service was identified by Mr. Krebs, he reported that the number of driver's license records the service listed increased by nearly 400,000. This, he suggests, indicates that "freshly stolen license data is being harvested and uploaded to this service on a semi-regular basis."[49]

50. Records included, for at least some individuals, six image files comprised of three pairs of photographs of the front and back of the document, with those pairs including a basic image scan, and infrared and ultraviolet versions of the same images, each with a date and time stamp appended to the file name.[50]

51. Individuals who located their own identification documents on the service confirmed that the time stamps associated with those documents corresponded to occasions on which they had physically handed the document to a business that used IDScan technology.[51] One such individual referenced by Mr. Krebs, prominent security and privacy researcher Zach Edwards, for example, later confirmed this association on X (fka Twitter): "Based on all the details in the article & how Brian was literally able to dox me (w/ consent!) (& the timing of the screenshot of

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

my license being added into the system aligning to my trip)), all the signs point to IDscan having a hellacious ongoing real-time breach of their data."[52]

52. On September 1, 2026, the New Orleans field office of the Federal Bureau of Investigation opened an official investigation into an apparent breach involving IDScan.[53]

53. On September 4, 2026, IDScan published a "Notification of Data Security Incident" on its own website.[54] The notice states that "[o]n or around September 1, 2026, IDScan.net received information indicating that certain data may have been accessed without authorization"; that "an unauthorized third party may have accessed and/or copied certain customer information stored within their accounts on the IDScan.net cloud"; that the affected information "may include full names and driver's license or other government-issued identification numbers"; and that "full access to the information required payment."[55] IDScan stated that it was "providing access to free credit monitoring and identity protection services" and was "cooperating with federal law enforcement on their investigation."[56]

54. IDScan limited the notice's public visibility by embedding a "noindex, follow" robots directive in the page's HTML, thereby instructing compliant search engines not to include

---

[52] Zach Edwards (@thezedwards), X (Sept. 1, 2026), https://x.com/thezedwards/status/2094929498877915599.

[53] KrebsOnSecurity, *supra* note 7; *see also* Reuters, FBI Probes Report of Data Breach Exposing Millions of Drivers' Licenses in US, Canada (Sept. 2, 2026), https://www.usnews.com/news/us/articles/2026-09-02/fbi-says-it-is-investigating-report-that-millions-of-us-drivers-licenses-exposed-in-data-breach (quoting Zach Edwards: "There's never been a breach of driver's licenses at this scale").

[54] *See* IDScan.net, Notification of Data Security Incident, *supra* note 13.

[55] *Id.*

[56] *Id.*

the notice in search results.[57] When honored, that directive prevents a consumer searching for information about the Data Breach from finding the notice through an ordinary Internet search, requiring the consumer instead to navigate IDScan's website or obtain a direct link to the notice. Although IDScan listed the notice in its website's press-release archive, it issued no separate press release or other affirmative public announcement directing affected consumers to the notice.

55. IDScan's admission is narrower than the facts. It concedes the loss of names and identification numbers. It does not address the loss of the images — the front, back, ultraviolet, and infrared photographs — which are what the Nexus marketplace was offering for sale and which IDScan's own product documentation says its cloud stores by default.

56. On the evening of September 1, 2026, shortly after the matter was reported publicly, Mr. Krebs reported that the Nexus service disappeared from the dark web, replacing its login page with the message "This service is no longer available."[58]

57. Taken together, the Nexus operators' description of a year-long exfiltration, the marketplace's addition of nearly 400,000 driver's-license records in twenty-four hours, the timestamps linking stolen documents to transactions involving IDScan technology, and IDScan's admission that information was accessed or copied from its cloud support the reasonable inference that the Data Breach resulted from a continuing compromise of IDScan's systems. The Data Breach was uncovered not by IDScan's security controls or Planet 13's oversight of its vendor, but only after criminals offered the stolen identification documents for sale and researchers recognized their own licenses among the records—by which time an extraordinary repository of government-issued identification documents had already passed beyond Defendants' control.

---

[57] *Id.* The relevant HTML meta tag reads "<meta name="robots" content="noindex, follow">". *Id.*

[58] *See* KrebsOnSecurity, *supra* note 7 (update of Sept. 1, 2026, 8:56 p.m. ET).

**E. Driver's License Content Cannot Be Canceled or Reissued, and a Record Identifying Its Holder as a Cannabis Customer Threatens Employment, Licensure, Immigration Status and Custody**

58. A typical government-issued identification document, such as a driver's license, contains the holder's full legal name, unique driver's license or ID card number, date of birth, residential address, sex, height, eye color, signature, full facial digital photograph, document number, issuing authority and expiration date.[59]

59. Unlike a payment card number or a password, the core identifying attributes contained in such identification documents—including the holder's date of birth and facial image—cannot readily be changed or replaced. Although a state or other governmental authority may issue a replacement credential, reissuance does not alter many of the underlying identifiers and personal characteristics exposed by the Data Breach. The exposure is permanent for practical purposes.

60. The infrared and ultraviolet images IDScan's technology captures magnify the sensitivity of the exposed records. Those images reveal security features used to distinguish genuine credentials from fraudulent ones—features specifically designed to resist reproduction and counterfeiting. Their disclosure therefore provides criminals with information about not only the document's visible contents, but also the characteristics used to authenticate it.[60]

61. The records also reveal an association with a cannabis dispensary. Because cannabis remains regulated under federal law and cannabis use remains relevant in certain employment, licensing, immigration, security-clearance, and firearms contexts, disclosure of a

---

[59] *See, e.g.,* 6 C.F.R. § 37.17 (describing requirements for REAL ID).

[60] *See* Am. Ass'n of Motor Vehicle Adm'rs, *Personal Identification—AAMVA North American Standard: 2025 AAMVA DL/ID Card Design Standard* §§ B.3.2–.3, B.4.2.2–.3, at 32, 35–36, 40–41 (ver. 1.0, June 2025), https://www.aamva.org/getmedia/81af105d-8b1b-45e1-aa46-f1800a259ed1/AAMVADLIDCardDesignStandard2025.pdf.

person's dispensary visit may expose that person to stigma, scrutiny, or adverse inferences—even if the person made no purchase and used no cannabis.

62. Certain individuals are exposed to a category of harm beyond the financial. People who have fled domestic violence, people subject to protective orders, and people whose safety depends on their residential address remaining unknown are placed at risk by the disclosure of a document that contains that address alongside a photograph.

63. Identity theft on this footing is neither rare nor abstract. The Federal Trade Commission's Consumer Sentinel Network received 6.5 million consumer reports in 2024, of which 70,332 concerned identity theft in the category "Government Documents or Benefits."[61] The Government Accountability Office has recorded that "malicious actors have used [stolen personal information] to fraudulently obtain government benefits and commit tax fraud," and that "thieves use identifying data, such as Social Security numbers and driver's license numbers, to open new financial accounts without a person's knowledge."[62]

64. Identification documents are property, and they are valuable. They are valuable to the person they identify, who cannot transact, travel, work, bank or vote without one. They are valuable to the businesses that collect them, which is why Defendants collected them and why IDScan built a business on processing them. Defendants also valued the identification information and images contained on the documents, which Defendants collected and processed for compliance, marketing, operational, and customer-profiling purposes. And the documents and information and images are valuable to criminals, which is why they were taken.

---

[61] Fed. Trade Comm'n, Consumer Sentinel Network Data Book 2024, at 2, 8 (Mar. 2025), https://www.ftc.gov/reports/consumer-sentinel-network-data-book-2024 (last visited Sept. 15, 2026).

[62] U.S. Gov't Accountability Office, Identity Verification: GSA Needs to Address Fraud Threats and Technical Issues, GAO-26-109261, at Highlights, 2, 9–10 (July 15, 2026), https://www.gao.gov/products/gao-26-109261 (last visited Sept. 9, 2026).

65. Defendants themselves treated the information as an asset rather than a burden. IDScan told prospective customers that its technology "provide[s] data that is incredibly valuable for marketing and operations," and that parsing the documents "allows Planet 13 to seamlessly harvest the names and demographic/geographic information of its guests."[63]

66. What Plaintiff and Class Members surrendered therefore had a market value, which Defendants realized and which Plaintiff and Class Members have now lost, because the same documents are available to anyone prepared to pay for them. Defendants derived commercial value from Plaintiff's and Class Members' identification information, while the Data Breach deprived those individuals of control over that information and exposed it to acquisition and misuse by anyone obtaining access.

67. Stolen identity information does not lose its utility quickly. GAO has found that bad actors may use stolen personal information for years after a breach and may combine it with information obtained from other sources to facilitate identity theft. The resulting risk to Plaintiff and Class Members is therefore continuing and long-term.[64]

---

[63] *See* Press Release, IDScan.net, *supra* note 6.

[64] U.S. Gov't Accountability Office, Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services, GAO-19-230 (Mar. 27, 2019), https://www.gao.gov/products/gao-19-230 (last visited Sept. 9, 2026); Press Release, U.S. Dep't of Justice, U.S. Att'y's Office, M.D. Fla., SSNDOB Marketplace, A Series Of Websites That Listed More Than 20 Million Social Security Numbers For Sale, Seized And Dismantled In International Operation (June 7, 2022), https://www.justice.gov/usao-mdfl/pr/ssndob-marketplace-series-websites-listed-more-20-million-social-security-numbers-sale (last visited Sept. 9, 2026).

**F. Defendants Represented That They Would Safeguard Consumers' Information and Were Legally Required to Do So**

68. Planet 13's publicly posted privacy policy expressly states that it applies "only" to www.planet13.com and describes its subject as personal information "submitted to [Planet 13] through the Site."[65] The policy therefore does not purport to govern or disclose Planet 13's collection, processing, transmission, or retention of identification information obtained at its physical dispensaries.

69. Planet 13 did not provide Plaintiff with any separate notice explaining that the identification document Plaintiff was required to present would be photographed under multiple light spectra, transmitted to IDScan's cloud, retained there under a default configuration that did not automatically delete the resulting records, and parsed to generate demographic and geographic information for marketing and operational purposes.

70. Planet 13 represented to its investors that it exercised care in selecting and supervising service providers. In its most recent annual report, Planet 13 stated: "We conduct thorough assessments of all third-party providers before engagement and maintain ongoing monitoring to ensure compliance with our cybersecurity standards."[66] In the same annual report, Planet 13 acknowledged both its responsibility for customer information and the foreseeable threat to that information. Planet 13 stated that it "may store and collect personal information about customers and [is] responsible for protecting that information from privacy breaches," and that "[t]heft of data for competitive purposes, particularly consumer lists and preferences, is an ongoing risk."[67]

---

[65] *See* Planet 13, *Privacy Policy*, https://planet13.com/privacy-policy/ (last visited Sept. 22, 2026).

[66] *See* Planet 13 Holdings Inc., Annual Report (Form 10-K), *supra* note 15 (Items 1A and 1C).

[67] *Id.* (Item 1A).

71. IDScan likewise marketed data security as a central feature of its services. IDScan described its cloud as a "secure cloud" and publicly announced that it had achieved "full SOC 2 compliance" and ISO/IEC 27001:2022 certification. In announcing its SOC 2 status, IDScan stated that "[e]nsuring the security and integrity of our customers' data is paramount." In announcing its ISO certification, IDScan represented that the certification reassured customers "that all data is handled with the utmost care and is in compliance with industry best practices."[68]

72. Defendants' representations paralleled legal duties imposed upon entities that collect, maintain, and disclose personal information. Nevada law requires a data collector maintaining personal information concerning a Nevada resident to "implement and maintain reasonable security measures" and requires a contract disclosing such information to obligate the recipient to implement and maintain equivalent safeguards. Illinois imposes materially identical obligations upon data collectors and their service providers. Florida likewise requires covered entities and third-party agents to take reasonable measures to protect electronic data containing personal information.[69]

73. Plaintiff and Class Members were required to present their identification documents if they wished to enter and transact at Planet 13's dispensaries. They could not negotiate or control the scanning technology, the categories of information extracted or photographed, the transmission

[68] *See* IDScan.net Support, How Can I Control What Visitor Data Is Collected and Retained?, https://support.idscan.net/veriscan-cloud-portal/data-collection-and-retention (last visited Sept. 21, 2026) (describing records as retained in IDScan's "secure cloud"); IDScan.net, IDScan.net Announces Full SOC 2 Compliance (Sept. 29, 2020), https://idscan.net/press-release/idscan-net-announces-full-soc-2-compliance/; IDScan.net, IDScan.net Achieves ISO 27001 Certification, Strengthening Commitment to Data Security and Privacy (Jan. 29, 2025), https://idscan.net/press-release/iso-27001-certified/.

[69] *See* Nev. Rev. Stat. § 603A.210(1), (3) (2025); 815 Ill. Comp. Stat. 530/45(a)–(b) (2024); Fla. Stat. § 501.171(2) (2026).

of that information to IDScan, the retention settings applied to it, or Planet 13's selection and supervision of the service provider entrusted with it.

74. Defendants knew or should have known that the identification records entrusted to them were a valuable target for cybercriminals and that their compromise would cause serious and lasting harm. Planet 13 expressly identified theft of customer information as an "ongoing risk." IDScan's business, products, and marketing were premised on the prevalence of identity fraud and the need to protect sensitive identification information against unauthorized access and misuse.

**G. The Data Breach Was Not Only Foreseeable but Foreseen: Defendants Recognized the Growing Risks of Third-Party Breaches and Identity Fraud**

75. Defendants did not have to imagine the risk that materialized here. The increasing frequency of data breaches, the vulnerability created by third-party service providers, and criminals' growing focus on static identity credentials were documented publicly and recognized in Defendants' own statements.

76. Data breaches are occurring at historically high rates. The Identity Theft Resource Center recorded 3,322 data compromises in the United States in 2025, up five percent from 3,152 in 2024. That is a record for the twenty years over which the Center has tracked data compromises, exceeding the previous high of 3,202 set in 2023.[70]

77. The danger that a company's customers would be exposed through a third-party service provider was likewise well documented. The Identity Theft Resource Center reported that the prevalence of supply-chain breaches doubled between 2021 and 2025, that approximately thirty percent of all breaches involved at least one third party, and that the number of entities affected by supply-chain attacks nearly doubled between 2024 and 2025.[71] Verizon's 2026 Data Breach

[70] Identity Theft Res. Ctr., 2025 Annual Data Breach Report, at 2, 4, 8 (Jan. 2026), https://www.idtheftcenter.org/publication/2025-data-breach-report/ (last visited Sept. 9, 2026).

[71] *See id.* at 4.

Investigations Report similarly found that breaches involving a third party increased by sixty percent in one year and accounted for forty-eight percent of all breaches.[72]

78. Static identity credentials were a known and increasingly frequent target. The Identity Theft Resource Center reported that criminals had "prioritized static identifiers that facilitate long-term identity fraud" and that compromises involving driver's-license information increased from 456 in 2021 to 1,094 in 2025.[73] The National Institute of Standards and Technology likewise warned that emerging attacks use generative artificial intelligence to "create or modify media that contain images or videos of applicants and evidence" to defeat automated document-validation and identity-proofing processes.[74] The compromise of authentic, high-resolution identification-document images therefore creates not only a risk of disclosure, but also a risk that genuine identity evidence can be reused or modified in subsequent impersonation and identity-proofing attacks.

79. Planet 13 expressly recognized these risks. As alleged above, Planet 13 acknowledged that it collected customers' personal information, was "responsible for protecting that information from privacy breaches," and faced an "ongoing risk" of customer-data theft. It also represented that it conducted "thorough assessments of all third-party providers before

---

[72] Verizon, Vulnerability Exploitation Top Breach Entry Point, 2026 Industry-Wide DBIR Finds (May 19, 2026), https://www.verizon.com/about/news/breach-industry-wide-dbir-finds (reporting that "third-party involvement in breaches is up 60%" and that breaches involving third parties accounted for forty-eight percent of all breaches).

[73] Identity Theft Res. Ctr., *supra* note 70, at 9.

[74] Nat'l Inst. of Standards & Tech., U.S. Dep't of Commerce, Digital Identity Guidelines: Identity Proofing and Enrollment, NIST SP 800-63A-4 § 3.14, at 32–34 (July 2025), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-63A-4.pdf.

engagement" and maintained "ongoing monitoring to ensure compliance with [its] cybersecurity standards."[75]

80. IDScan likewise understood the sensitivity and criminal value of the information entrusted to it. IDScan markets its business as "ID fraud prevention at scale," states that its identity-verification models are trained on hundreds of millions of identity documents, and sells technology designed to detect forged or altered identity credentials.[76] IDScan also promoted its SOC 2 compliance and ISO/IEC 27001 certification as evidence of the controls it employed to protect customer data.[77]

81. Despite this knowledge, Defendants deployed a centralized cloud system capable of capturing and retaining high-resolution images of the front and back of identification documents, including ultraviolet and infrared images, and of extracting the documents' contents for marketing and operational purposes. On information and belief, IDScan configured new accounts by default to "Collect all" information and "retain all records" in its cloud without automatic deletion. On information and belief, Defendants failed to impose and enforce data-minimization, retention, access-control, and monitoring measures sufficient to prevent or promptly detect the continuing exfiltration alleged by the Nexus operators. Defendants did not discover and

---

[75] *See* Planet 13 Holdings Inc., Annual Report (Form 10-K), at 47, 58 (2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001813452/d27263a1-ccd2-455c-81b0-54e7cd18ba61.pdf (Items 1A and 1C).

[76] *See* IDScan.net, ID Fraud Prevention & ID Verification, https://idscan.net/ (last visited Sept. 21, 2026).

[77] *See* IDScan.net, IDScan.net Announces Full SOC 2 Compliance (Sept. 29, 2020), https://idscan.net/press-release/idscan-net-announces-full-soc-2-compliance/; IDScan.net, IDScan.net Achieves ISO 27001 Certification, Strengthening Commitment to Data Security and Privacy (Jan. 29, 2025), https://idscan.net/press-release/iso-27001-certified/.

disclose the compromise through their own controls; the compromise became public only after the stolen identification documents were offered for sale on a criminal marketplace.[78]

**H. Defendants Disregarded Published FTC Guidance on Data Minimization, Retention, Security, and Vendor Oversight**

82. For years before the Data Breach, the Federal Trade Commission published guidance identifying basic practices for businesses that collect and maintain sensitive personal information. That guidance placed Defendants on notice of the risks created by unnecessary collection, prolonged retention, inadequate technical safeguards, and insufficient oversight of service providers.

83. In October 2016, the Commission published *Protecting Personal Information: A Guide for Business*.[79] The Guide organized a sound data-security program around five principles: identify the personal information the business possesses; retain only what the business needs; protect retained information; securely dispose of information that is no longer needed; and prepare in advance to respond to security incidents.[80]

84. On data minimization, the Commission instructed businesses not to collect sensitive identifying information for which they lack a legitimate business need and to retain legitimately collected information only for as long as necessary.[81] Although Planet 13 had reason

---

[78] *See* IDScan.net Support, How Can I Control What Visitor Data Is Collected and Retained?, https://support.idscan.net/veriscan-cloud-portal/data-collection-and-retention (last visited Sept. 21, 2026); IDScan.net, Planet 13 Case Study, *supra* note 3; Press Release, IDScan.net, *supra* note 6; KrebsOnSecurity, *supra* note 7.

[79] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Sept. 21, 2026).

[80] *See id.*

[81] *See id.*

to verify the age and identity of its customers, no identified legal requirement required Defendants, after completing that verification, to retain full-resolution images of the front and back of each identification document—including ultraviolet and infrared images—in a centralized third-party cloud or to use information extracted from those documents for marketing and business analytics.

85. On retention, the Commission advised businesses to retain sensitive information only while a legitimate business reason exists, securely dispose of it when that reason ends, and maintain a written retention policy specifying what information will be kept, how it will be protected, how long it will be retained, and how it will be destroyed.[82] IDScan nevertheless configured new accounts by default to collect all available information and retain all records in its cloud. On information and belief, Defendants did not impose or enforce a retention period requiring the timely deletion of the identification-document images collected from Planet 13 customers.

86. On technical safeguards, the Commission advised businesses to encrypt sensitive information both in transit and at rest, restrict access according to the principle of least privilege, maintain centralized security logs, and monitor outgoing network traffic for unexpectedly large or unauthorized transfers.[83] The recurring exfiltration of identification documents over more than a year, without detection by Defendants, supports the inference that Defendants failed to implement, configure, or effectively operate security controls reasonably commensurate with the sensitivity and volume of the information they retained.

---

[82] *Id.*; *see also* IDScan.net Support, VeriScan Cloud Portal—Data Collection and Retention, *supra* note 35.

[83] Fed. Trade Comm'n, *Protecting Personal Information*, *supra* note 79; *see also* Fed. Trade Comm'n, *Start with Security: A Guide for Business* (updated Aug. 2023), https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Sept. 21, 2026).

87. The condition of the stolen data provides additional evidence concerning those failures. The identification-document images obtained from IDScan's cloud were available to the Nexus operators in readable and usable form. That fact supports the inference that the images were stored without effective encryption, that the decryption keys were compromised or insufficiently segregated, or that the intruders obtained credentials or other privileged access through which IDScan's systems decrypted and exported the images. Under any of those circumstances, Defendants' encryption, key-management, credential, and access controls failed to prevent the unauthorized acquisition and use of the identification documents.

88. On service providers, the Commission instructed businesses to investigate a vendor's security practices before entrusting it with sensitive information, place security requirements in their contracts, independently verify compliance, and require notification of security incidents.[84] The Commission later reiterated that businesses should not merely accept a vendor's assurances but should establish a process for confirming that the vendor follows the required safeguards. Planet 13 nevertheless transmitted its customers' identification documents to IDScan's cloud and, on information and belief, failed to ensure that IDScan minimized the information retained, imposed an appropriate deletion schedule, and maintained effective controls against unauthorized access and bulk exfiltration.

89. Section 5 of the Federal Trade Commission Act declares unlawful "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The Commission has invoked that provision in data-security enforcement actions and has published case-based guidance

---

[84] Fed. Trade Comm'n, *Protecting Personal Information*, *supra* note 79; Andrew Smith, *Cybersecurity for Small Business: Vendor Security, Fed. Trade Comm'n* (Dec. 21, 2018), https://www.ftc.gov/business-guidance/blog/2018/12/cybersecurity-small-business-vendor-security (last visited Sept. 21, 2026).

identifying the security failures alleged in more than eighty such actions.[85] That guidance provided Defendants with additional notice of the practices the Commission regarded as material to the reasonable protection of sensitive consumer information.[86]

90. Defendants' alleged failures correspond to the risks the Commission had repeatedly identified: unnecessary retention of sensitive information; failure to dispose of information after the need for it ended; inadequate restriction and monitoring of access; insufficient detection of unauthorized outgoing transfers; and inadequate oversight of a service provider entrusted with customer information.

91. These risks were neither novel nor unforeseeable. They were described in publicly available federal guidance years before the Data Breach. Given the nature of IDScan's identity-verification business, Planet 13's decision to entrust customer identification documents to IDScan, and both Defendants' representations concerning data security, Defendants knew or should have known of those risks and of the need to implement safeguards commensurate with them.

### I. Defendants Disregarded Published Cybersecurity Frameworks and Standards Relevant to Their Operations

92. Long before the Data Breach, recognized cybersecurity organizations had published frameworks and standards identifying controls for the collection, retention, protection, and disposal of sensitive information and for the management of risks arising from service providers. IDScan publicly represented that it had been certified to one of those standards.

93. The National Institute of Standards and Technology publishes the Cybersecurity Framework, now in version 2.0. Although the Framework is nonprescriptive and may be adopted voluntarily, it identifies cybersecurity outcomes applicable to organizations of every size and

---

[85] 15 U.S.C. § 45(a)(1); Fed. Trade Comm'n, *Start with Security*, *supra* note 83; *see also* FTC v. Wyndham Worldwide Corp., 799 F.3d 236, 240–50 (3d Cir. 2015).

[86] *Id.*

sector.[87] Its GOVERN function includes a Cybersecurity Supply Chain Risk Management category calling for organizations to conduct due diligence before entering supplier relationships; incorporate cybersecurity requirements into contracts; and assess, respond to, and monitor supplier risks throughout the relationship.[88]

94. NIST's companion control catalog, Special Publication 800-53, identifies more specific controls. Control SI-12 addresses information management and retention throughout the information lifecycle. Its information-disposal enhancement directs organizations to establish techniques for disposing of, destroying, or erasing information after the applicable retention period and explains that disposal should extend to originals, copies, and archived records.[89]

95. The Center for Internet Security publishes the CIS Critical Security Controls, now in version 8.1. Its Data Protection safeguards direct an enterprise to establish a data-management process addressing sensitivity, ownership, handling, retention limits, and disposal requirements; establish both minimum and maximum retention periods; dispose of data through methods

---

[87] *See* Nat'l Inst. of Standards & Tech., U.S. Dep't of Commerce, *The NIST Cybersecurity Framework (CSF) 2.0*, NIST CSWP 29, at 1–4 (Feb. 26, 2024), https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.29.pdf (last visited Sept. 21, 2026).

[88] *See id.* at 17–18 (Cybersecurity Supply Chain Risk Management category GV.SC, including GV.SC-05 through GV.SC-09).

[89] *See* Joint Task Force, Nat'l Inst. of Standards & Tech., U.S. Dep't of Commerce, *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, rev. 5, at 352–53, control SI-12(3) (Sept. 2020, updated Dec. 10, 2020), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf (last visited Sept. 21, 2026).

commensurate with its sensitivity; encrypt sensitive data at rest; deploy data-loss-prevention technology; and log access to sensitive data.[90]

96. ISO/IEC 27001:2022 specifies requirements for establishing, implementing, maintaining, and continually improving an information security management system through which an organization identifies and manages risks to the security of information it owns or handles.[91] On January 29, 2025, IDScan announced that it had obtained certification to ISO/IEC 27001:2022. IDScan expressly represented that the certification's scope included its VeriScan age-verification and visitor-management software—the system used to collect and retain Planet 13 customers' identification documents.[92] IDScan invoked that certification to assure its clients that their data was being handled with care and in accordance with industry best practices.[93]

97. The conduct alleged here departed from the controls identified by these frameworks and standards. IDScan configured new accounts by default to collect all available information and retain all records. On information and belief, Defendants did not establish or enforce a maximum retention period requiring deletion of the identification-document images after verification. Defendants did not detect the recurring exfiltration of large volumes of image data over a period

---

[90] Ctr. for Internet Sec., Inc., CIS Critical Security Controls Version 8.1, safeguards 3.1, 3.4, 3.5, 3.11, 3.13 & 3.14 (June 2024), https://www.cisecurity.org/controls/v8-1 (last visited Sept. 21, 2026).

[91] *See* Int'l Org. for Standardization & Int'l Electrotechnical Comm'n, *Information Security, Cybersecurity and Privacy Protection—Information Security Management Systems—Requirements*, ISO/IEC 27001:2022 (3d ed. Oct. 25, 2022), https://www.iso.org/standard/27001 (last visited Sept. 21, 2026).

[92] IDScan.net, IDScan.net Achieves ISO 27001 *Certification, Strengthening Commitment to Data Security and Privacy* (Jan. 29, 2025), https://idscan.net/press-release/iso-27001-certified/ (last visited Sept. 21, 2026).

[93] *See id.*

exceeding one year. And the availability of the stolen images in readable and usable form supports the inference that Defendants' encryption, key-management, credential, access-control, data-loss-prevention, or monitoring safeguards were absent, improperly configured, compromised, or ineffective.

98. These controls were published well before the reported exfiltration began. Their relevance to IDScan cannot reasonably be disputed: IDScan voluntarily sought ISO/IEC 27001:2022 certification, included VeriScan within the certification's scope, and publicly relied on that certification to assure customers that it had properly addressed the security of their information.

**J. Defendants Failed to Employ Reasonable and Readily Available Security Measures**

99. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits unfair acts or practices in or affecting commerce. The Federal Trade Commission has long brought enforcement actions alleging that businesses engaged in unfair practices by failing to employ reasonable measures to protect personal information they collected. The Commission's published guidance advises businesses to limit the personal information they collect and retain, securely dispose of information they no longer need, protect sensitive information through properly configured encryption and access controls, oversee the security practices of service providers, and monitor for unauthorized access and anomalous transfers.[94]

100. Nevada imposes an express statutory duty. NRS 603A.210(1) provides that "[a] data collector that maintains records which contain personal information of a resident of this State

---

[94] *See* Fed. Trade Comm'n, *Protecting Personal Information*, *supra* note 79; Fed. Trade Comm'n, *Start with Security*, *supra* note 83; Andrew Smith, *Cybersecurity for Small Business: Vendor Security*, Fed. Trade Comm'n (Dec. 21, 2018), https://www.ftc.gov/business-guidance/blog/2018/12/cybersecurity-small-business-vendor-security.

shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification or disclosure."[95]

101. Nevada imposes a corresponding obligation on contracts through which personal information is disclosed to a service provider. NRS 603A.210(3) provides that "[a] contract for the disclosure of the personal information of a resident of this State which is maintained by a data collector must include a provision requiring the person to whom the information is disclosed to implement and maintain reasonable security measures" against unauthorized access, acquisition, destruction, use, modification, or disclosure.[96]

102. Planet 13 and IDScan each qualify as a "data collector" because each is a business entity that handles, collects, disseminates, or otherwise deals with nonpublic personal information.[97] The records at issue contain the combination of an individual's name and the individual's driver's-license or identification-card number that Nevada law defines as "personal information" when the name and data elements are not encrypted.[98]

103. Florida imposes a corresponding security obligation through the Florida Information Protection Act of 2014. The Act requires "[e]ach covered entity, governmental entity, or third-party agent" to "take reasonable measures to protect and secure data in electronic form containing personal information." It defines a "covered entity" as a commercial entity that acquires, maintains, stores, or uses personal information and a "third-party agent" as an entity contracted to maintain, store, or process personal information on a covered entity's behalf. "Personal information" expressly includes an individual's name in combination with a driver's-

---

[95] Nev. Rev. Stat. § 603A.210(1).

[96] *Id.* § 603A.210(3).

[97] *Id.* § 603A.030.

[98] *Id.* § 603A.040(1)(b).

license number, identification-card number, passport number, or similar government-issued number used to verify identity.[99]

104. Florida law separately allocates responsibility between a business and its data-processing vendor following a breach. A third-party agent that determines, or has reason to believe, that a breach occurred must notify the covered entity as expeditiously as practicable and no later than ten days thereafter and must provide the information necessary for the covered entity to comply with its own notification obligations. The covered entity, in turn, generally must notify affected individuals in Florida—and, when the breach affects at least 500 individuals, the Florida Department of Legal Affairs—as expeditiously as practicable and no later than thirty days after determining, or having reason to believe, that a breach occurred.[100]

105. Illinois imposes substantially similar requirements. The Illinois Personal Information Protection Act requires a data collector that owns or licenses—or merely maintains or stores—records containing personal information concerning an Illinois resident to "implement and maintain reasonable security measures" protecting those records from unauthorized access, acquisition, destruction, use, modification, or disclosure. It further requires every contract for the disclosure of such information to contain a provision requiring the recipient to implement and maintain the same protections.[101]

106. Illinois law expressly treats a name combined with a driver's-license or state-identification-card number as personal information when the information is unencrypted or when it is encrypted but "the keys to unencrypt or unredact or otherwise read" the information were acquired without authorization. A data collector that stores but does not own the information must notify its owner or licensee "immediately following discovery" of a breach and must cooperate by disclosing the nature and approximate date of the breach and the measures taken or planned in

---

[99] Fla. Stat. § 501.171(1)(b), (g), (h), (2) (2026).

[100] *Id.* § 501.171(3), (4), (6).

[101] 815 Ill. Comp. Stat. 530/5, 530/45(a)–(b).

response. The owner or licensee must notify affected Illinois residents in the most expedient time possible and without unreasonable delay.[102]

107. Defendants failed to employ reasonable measures commensurate with the sensitivity and volume of that information. Although Nevada required Planet 13 to verify a customer's age using an approved identification scanner, the statute did not require Defendants to preserve full-resolution images of the identification document—including ultraviolet and infrared images—after verification was complete.[103] Defendants nevertheless transmitted those images to IDScan's centralized cloud and, on information and belief, retained them without an appropriate maximum retention period or enforceable deletion schedule.

108. The duration and scale of the exfiltration support an inference that Defendants' monitoring and access controls were inadequate. The Nexus operators stated that they had continuously exfiltrated new information for more than a year, and the number of driver's-license records advertised by the service increased by nearly 400,000 during the twenty-four hours after the service came to public attention. Yet Defendants did not identify or stop the exfiltration. The intrusion instead became known only after the stolen documents were advertised for sale and a journalist recognized his own driver's license among the sample.

109. The condition of the stolen data supports a further inference concerning Defendants' encryption and access controls. The identification-document images obtained from IDScan's cloud were available to the Nexus operators in readable and usable form. On information and belief, the images were stored without effective encryption, the associated cryptographic keys were compromised or insufficiently segregated, or the intruders obtained credentials or other privileged access through which IDScan's systems decrypted and exported the images. Under any

---

[102] Id. 530/5, 530/10(a)–(b). A violation of the Act constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.* 530/20.

[103] Nev. Rev. Stat. § 678B.545.

of those circumstances, Defendants' encryption, key-management, credential, and access controls failed to prevent unauthorized acquisition and use of the identification documents.

110. Reasonable and readily available measures would have prevented the Data Breach or materially reduced its likelihood, duration, or scope. Those measures included declining to retain full identification-document images after authentication; establishing a short, purpose-based retention period; configuring VeriScan to purge records rather than retain all information by default; encrypting retained images with properly segregated and managed keys; restricting access according to least privilege; requiring multifactor authentication for privileged access; segmenting systems containing identity documents; logging access to sensitive images; deploying data-loss-prevention controls; and monitoring for anomalous queries, bulk exports, and outbound data transfers.

111. Planet 13 did not discharge its responsibility for its customers' identification documents by transmitting them to IDScan. Planet 13 selected and deployed IDScan's system, installed IDScan scanners at its check-in stations, required customers to present their identification documents to those scanners, and caused the resulting information to be transmitted to IDScan's cloud. Nevada law required the contract governing that disclosure to require IDScan to maintain reasonable security measures. On information and belief, Planet 13 either failed to include the required provision or failed to determine whether IDScan was complying with it.

112. Nevada law also assigns notification duties according to the parties' respective ownership and custody of the information. A data collector that owns or licenses computerized data containing personal information must notify affected Nevada residents "in the most expedient time possible and without unreasonable delay" after discovering or receiving notification of a breach.[104] A data collector that maintains such data for another entity must notify the owner or licensee "immediately following discovery."[105]

[104] Nev. Rev. Stat. § 603A.220(1).

[105] *Id.* § 603A.220(2).

113. IDScan states that it received information concerning the unauthorized access on or about September 1, 2026. If IDScan maintained the affected information on Planet 13's behalf, NRS 603A.220(2) required IDScan to notify Planet 13 immediately after discovery. If Planet 13 owned or licensed the information, its corresponding duty to notify affected Nevada residents under NRS 603A.220(1) arose upon its discovery or receipt of notice of the breach. Whether and when IDScan notified Planet 13, what information that notice contained, and what Planet 13 did after receiving it are matters peculiarly within Defendants' knowledge. As of the filing of this Complaint, Planet 13 had not publicly disclosed when it learned of the Data Breach or what measures it took in response.

114. Florida and Illinois impose corresponding notification duties concerning affected individuals in Florida and Illinois residents. If IDScan maintained the affected information on Planet 13's behalf, Florida law required IDScan to notify Planet 13 as expeditiously as practicable and no later than ten days after determining, or having reason to believe, that the breach occurred, while Illinois law required IDScan to notify the owner or licensee immediately following discovery. Planet 13's corresponding duties to notify affected individuals under Florida and Illinois law arose upon its own discovery or receipt of notice of the breach. Whether Defendants complied with those duties is likewise a matter peculiarly within their knowledge.[106]

**K. Defendants Breached Their Duties to Plaintiff and the Class by Capturing and Retaining More Than Was Needed and Failing to Detect Its Removal for Over a Year**

[106] Fla. Stat. § 501.171(4), (6) (2026); 815 Ill. Comp. Stat. 530/10(a)–(b).

115. Defendants breached their duties and obligations to Plaintiff and Class Members, and were otherwise negligent and reckless, because they failed properly to maintain and safeguard the identification documents they collected and the Private Information[107] contained in them.

---

[107] As used herein, "Private Information" means the nonpublic personal, identifying, and sensitive information concerning Plaintiff and Class Members that Defendants collected, captured, extracted, parsed, transmitted, stored, maintained, or otherwise processed from or in connection with their government-issued identification credentials and that was accessed, acquired, copied, exfiltrated, disclosed, or otherwise compromised in the Data Breach. Private Information includes, without limitation and where present: (a) names, dates of birth, residential addresses, sex, physical characteristics, signatures, and photographs; (b) driver's-license, identification-card, passport, travel-document, medical-card, cannabis-registry-card, and other government-issued credential numbers; (c) the credential's type, issuing authority or jurisdiction, issuance and expiration dates, classifications, restrictions, and endorsements; (d) information encoded in barcodes, magnetic stripes, machine-readable zones, or other machine-readable portions of the credential; (e) digital images of the front and back of the credential, including visible-light or basic images and ultraviolet and infrared images revealing authentication and security features; (f) cropped identification photographs and other images associated with the credential holder; (g) metadata associated with the scan, including the date and time of collection and, where maintained, the source, customer account, device, or location associated with the scan; and (h) information revealing or permitting the inference that an identified individual entered, visited, or transacted at a Planet 13 cannabis dispensary. "Private Information" includes each of these categories individually and in combination and is not intended to narrow any broader definition of "personal information," "personally identifiable information," "personal data," "sensitive personal information," or a comparable term under applicable law.

116. That information was held on Defendants' systems in a manner that left it vulnerable. As set out above, breaches reaching a company's customers through a vendor are an increasingly prevalent category of data compromise, and Defendants were on notice of that fact.

117. Defendants' unlawful conduct includes, but is not limited to, the following acts and omissions:

a. Capturing and retaining full-resolution photographic images of government-issued identification documents—including ultraviolet and infrared images—beyond what was necessary to verify a consumer's age, identity, or eligibility;

b. Retaining those images, and the data parsed from them, after the purpose for which they were collected had been satisfied;

c. On information and belief, configuring or permitting the configuration of the vendor's retention settings to "collect all" and "do not delete," rather than to purge;

d. Failing to protect the stored images through effective encryption and properly segregated cryptographic keys, or otherwise failing to prevent unauthorized persons from obtaining the images in readable and usable form;

e. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

f. Failing to monitor the systems within their control or responsibility for existing intrusions and for the exfiltration of large volumes of image data over a period exceeding one year;

g. Failing to employ industry standard data security protections, including those published by the National Institute of Standards and Technology and the Center for Internet Security;

h. Failing to investigate, specify by contract, and verify the data security practices of the service provider to which Planet 13 entrusted its customers' identification documents;

i. Failing to implement and maintain reasonable security measures to protect records containing the personal information of Nevada residents from unauthorized access,

acquisition, destruction, use, modification, or disclosure, in violation of NRS 603A.210(1);

j. As to Planet 13, failing to include in the contract governing the disclosure of personal information to IDScan a provision requiring IDScan to implement and maintain reasonable security measures, in violation of NRS 603A.210(3), or failing to enforce or verify compliance with such a provision if one existed;

k. Failing to take reasonable measures to protect and secure electronic data containing the personal information of affected individuals in Florida, in violation of Fla. Stat. § 501.171(2);

l. Failing to implement and maintain reasonable security measures to protect records containing the personal information of Illinois residents from unauthorized access, acquisition, destruction, use, modification, or disclosure, in violation of 815 Ill. Comp. Stat. 530/45(a);

m. As to Planet 13, failing to include in the contract governing the disclosure of the personal information of Illinois residents a provision requiring IDScan to implement and maintain reasonable security measures, in violation of 815 Ill. Comp. Stat. 530/45(b), or failing to enforce or verify compliance with such a provision if one existed;

n. On information and belief, failing to disclose the breach of the security of the system data to affected Nevada residents in the most expedient time possible and without unreasonable delay, in violation of NRS 603A.220(1), and, as to IDScan, failing to notify the owner or licensee of the data immediately following discovery, in violation of NRS 603A.220(2);

o. On information and belief, failing to provide the notices required by Florida law, including IDScan's obligation as a third-party agent to notify the covered entity as expeditiously as practicable and no later than ten days after determining, or having reason to believe, that a breach occurred, and the covered entity's corresponding

obligation to notify affected individuals in Florida, in violation of Fla. Stat. § 501.171(3), (4), and (6);

p. On information and belief, failing to provide the notices required by Illinois law, including IDScan's obligation as the custodian of information belonging to another to notify the owner or licensee immediately following discovery and cooperate concerning the breach, and the owner or licensee's corresponding obligation to notify affected Illinois residents in the most expedient time possible and without unreasonable delay, in violation of 815 Ill. Comp. Stat. 530/10(a)–(b);

q. Capturing and retaining personally identifiable information beyond what was necessary to determine the age of the consumer, contrary to Nevada's expressed policy that regulations governing adult-use cannabis must not require a consumer to provide personally identifiable information other than government-issued identification needed to determine the consumer's age, as reflected in NRS 678D.500; and

r. To the extent the affected personal identifying information was contained in or integrated with Planet 13's statutory inventory control system, failing to exercise reasonable care to ensure that the information was encrypted, protected, and not divulged for any purpose not specifically authorized by law, in violation of NRS 678B.505(4) as to conduct on and after June 10, 2025, and, as to earlier conduct involving Class Members who held registry identification cards, former NRS 678C.430(4).

118. As a result of maintaining their systems in this condition, Defendants permitted the identification documents of Plaintiff and Class Members to be removed and offered for sale on a criminal marketplace.

119. Accordingly, Plaintiff and Class Members now face an increased and imminent risk of fraud and identity theft.

**L. This Is Not a Risk of Future Misuse: The Documents Were in Criminal Hands, Indexed and Offered for Sale**

120. This is not a case in which stolen information might one day reach criminal hands. Criminal operators already possessed the documents, made them searchable and previewable, and offered access to them for payment.

121. The Nexus marketplace did not merely hold the documents. It indexed them so that a purchaser could search for a particular person, and it displayed previews before purchase. Its operators stated that "[r]ecords are available to preview before purchase with pertinent information redacted" and that "[c]ustomer photos are displayed if available."[108]

122. The categories of identity document offered for sale included: more than 153 million driver's licenses from the United States and Canada; more than 10 million identification cards; more than three million travel documents and international identification documents; and at least 579,000 medical cards.[109]

123. For at least some individual records, the material offered included six image files: three pairs of photographs showing the front and back of the document, consisting of a standard visible-light scan, an infrared scan, and an ultraviolet scan. A date and time stamp was appended to each image file, recording when the document was scanned. The service also displayed a separate customer photograph when one was available.[110]

124. The inventory was growing. In the twenty-four hours after the service was identified, the number of driver's license records it listed increased by nearly 400,000, and its operators stated that they had been "continuously exfiltrating new data for over a year into our private database."[111]

---

[108] *See* KrebsOnSecurity, *supra* note 7.

[109] *Id.*

[110] *Id.*

[111] *Id.*

125. IDScan has acknowledged that access to the material was conditioned on payment. Its own notice states that "full access to the information required payment."[112]

126. Individuals located their own identification documents on the service, and the time stamps corresponded to occasions on which they had presented those documents to businesses publicly identified as users of IDScan technology, including Planet 13 and Hertz.[113]

127. The documents were not merely displayed behind the Nexus marketplace's login page. The operators distributed at least one document—cybersecurity journalist Brian Krebs's driver's license—as a free sample in their initial sales thread on a Russian cybercrime forum. The Nexus website disappeared from the dark web on the evening of September 1, 2026, shortly after it was publicly reported.[114] Its disappearance did not retrieve the sample already distributed or establish that the operators destroyed the underlying database. On information and belief, the operators retained copies of the exfiltrated documents, and any copies downloaded or otherwise distributed before the service disappeared remain beyond Defendants' control and in circulation.

### M. The Burden of Responding Falls on the Victims, and Replacing a Driver's License Cannot Undo the Exposure

128. Once a digital image of an identification document has been stolen, the burden of monitoring for and responding to its misuse falls principally on the person whose document was compromised.

129. In 2019 the Government Accountability Office examined what consumers can do after a data breach. Its report states that the accompanying figure "provides information on actions consumers can take to monitor for identity theft or other forms of fraud, protect their personal

---

[112] *See* IDScan.net, *Notification of Data Security Incident*, *supra* note 13.

[113] *See* KrebsOnSecurity, *supra* note 7.

[114] *Id.* (reporting that the operators distributed Krebs's driver's license as a free sample in their initial sales thread; update of Sept. 1, 2026, 8:56 p.m. ET).

information, and respond if they have been a victim of identity theft." That figure runs to five pages.[115]

130. The same report records that "large amounts of personal information are outside of consumers' control and bad actors can use stolen information for years after a breach," and that the services commonly offered after a breach "do not prevent fraud from happening in the first place."[116] It further reports that experts objected that "the burden should not be on consumers to protect data they do not control."[117]

131. The Federal Trade Commission directs victims to place a credit freeze with each of the three nationwide credit reporting agencies, to place a fraud alert with one of them, to obtain and review their credit reports, and to report identity theft to the Commission in order to obtain a recovery plan.[118] Those measures take time, and monitoring and certain protective measures must be continued or renewed. They also cannot retrieve a stolen identification-document image, render it unusable, or prevent forms of misuse that do not depend on access to a consumer's credit report.

132. The Government Accountability Office has reported the Federal Trade Commission's finding that victims of identity theft "may face substantial costs and time to repair the damage to their good name and credit record."[119]

---

[115] *See* U.S. Gov't Accountability Office, GAO-19-230, *supra* note 64, at 36–41.

[116] *Id.* at 14–15.

[117] *Id.* at 14.

[118] Fed. Trade Comm'n, What To Know About Identity Theft (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited Sept. 9, 2026).

[119] U.S. Gov't Accountability Office, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737, at 1–2 (June 4, 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Sept. 15, 2026).

133. Replacing a compromised identification document imposes additional burdens and, depending on the issuing State, may require an application, a fee, or an in-person visit. More fundamentally, replacement does not undo the exposure. Even if the issuing State invalidates the former credential or assigns a new document number, it cannot retrieve the exfiltrated images or change the holder's name, date of birth, physical characteristics, signature, and substantially similar photograph already in criminal hands.

**N. The Misuse of Information Taken in Data Breaches Inflicts Documented Financial, Practical and Physical Harm**

134. Identity misuse made possible by the theft of personal information is not a mere inconvenience. It can impose measurable financial, practical, emotional, and physical consequences on the people whose information is taken, and those consequences are documented.

135. The Identity Theft Resource Center surveys identity-crime victims each year and publishes the results. Its 2025 Consumer Impact Report analyzes two distinct groups. The first consisted of individuals who had sought the Center's assistance, four percent of a representative sample of whom completed the survey. The second consisted of 1,033 general consumers who had not contacted the Center, including 401 individuals who reported having been victims of an identity crime.[120]

136. Among the general-consumer victims surveyed in 2025, the Center reports that this group "reported being turned down for credit or loans at a rate of 50.6 percent (50.6%), being unable to pay bills at 42 percent (42%) and being unable to rent an apartment or find housing at 41.7 percent (41.7%)," and that these figures "represent a massive increase from 2024, when the

[120] *See* Identity Theft Res. Ctr., *2025 Consumer Impact Report*, at 5 (Oct. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/10/The-2025-ITRC-Consumer-Impact-Report.pdf (last visited Sept. 11, 2026).

same impacts were reported at rates of 28.3 percent (28.3%), 29.8 percent (29.8%) and 29.7 percent (29.7%), respectively."[121]

137. Among the victims who had sought the Center's assistance, it reports that "33.3 percent (33.3%) were unable to pay their bills, 30.1 percent (30.1%) were contacted by debt collectors and 27.6 percent (27.6%) were turned down for new credit or loans," and that 45.5 percent of that cohort reported having to "go without" a basic need because of their financial circumstances. More than twenty percent of the same cohort reported losses exceeding $100,000.[122]

138. The harm is not only financial. Of the victims who sought the Center's assistance in 2025, "an overwhelming 83.3 percent (83.3%) reported feeling worried or anxious, 78.6 percent (78.6%) felt violated, 75.4 percent (75.4%) felt vulnerable and 73 percent (73%) felt angry."[123] The Center further reports that "73.6 percent (73.6%) reported experiencing stress described as being tense, nervous or irritable; 65.6 percent (65.6%) suffered from sleep problems; and 39.2 percent (39.2%) had panic or anxiety attacks."[124]

139. Among general-consumer victims the same physical effects rose sharply year-over-year: "[t]he percentage of these victims reporting sleep problems jumped from 39.4 percent (39.4%) in 2024 to 50.4 percent (50.4%) in 2025, and reports of persistent aches, pains or headaches rose from 32.2 percent (32.2%) to 48.8 percent (48.8%) in the same period."[125]

140. The harm may also be delayed, which is why it cannot be measured on the day a breach is discovered. As the Government Accountability Office has reported: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being

---

[121] *Id.* at 16.

[122] *Id.* at 15–16.

[123] *Id.* at 13.

[124] *Id.* at 14.

[125] *Id.*

used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[126]

141. Plaintiff and Class Members are therefore exposed to a risk that is both present and enduring. Their identification-document images have already been obtained by criminals and offered for sale. Although an issuing agency may invalidate or replace a credential, it cannot retrieve the exfiltrated images, change the holder's core identity attributes, or ensure that copies held by criminals have been destroyed or rendered unusable.

**O. Planet 13 Has Made No Public Disclosure and, on Information and Belief, Has Not Notified Affected Customers, Compounding the Harm**

142. Under NRS 603A.220(1), a data collector that owns or licenses computerized data including personal information "shall disclose any breach of the security of the system data following discovery or notification of the breach to any resident of this State whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." The statute requires disclosure "in the most expedient time possible and without unreasonable delay," consistent with legitimate law-enforcement needs or measures necessary to determine the scope of the breach and restore the reasonable integrity of the system data.[127] Under NRS 603A.220(2), a data collector that maintains computerized data it does not own must notify the owner or licensee "immediately following discovery" if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person.[128]

143. Florida and Illinois impose corresponding notification obligations. Florida requires a covered entity to notify each individual in the State whose personal information was, or is reasonably believed to have been, accessed as a result of a breach, "as expeditiously as practicable and without unreasonable delay," and generally no later than thirty days after determining that a

---

[126] *See* U.S. Gov't Accountability Office, GAO-07-737, *supra* note 119, at 29.

[127] Nev. Rev. Stat. § 603A.220.

[128] *Id.*

breach occurred or having reason to believe that one occurred. A third-party agent must notify the covered entity as expeditiously as practicable and generally no later than ten days after making that determination or having reason to believe that a breach occurred.[129] Illinois requires a data collector that owns or licenses personal information concerning an Illinois resident to notify the resident "in the most expedient time possible and without unreasonable delay," and requires a data collector that merely maintains or stores the information to notify its owner or licensee "immediately following discovery."[130]

144. Planet 13 has made no public disclosure concerning the Data Breach. As of the date of this Complaint, a review of Planet 13's website, its investor-relations press-release archive, and its public filings with the United States Securities and Exchange Commission disclosed no notice, press release, or securities filing concerning the Data Breach.[131] On information and belief, Planet 13 has provided no individual notice to Plaintiff or Class Members and has offered them neither credit-monitoring nor identity-restoration services.

145. On September 4, 2026, IDScan posted a notice concerning the Data Breach on its website. IDScan embedded a "noindex, follow" directive in the notice page's HTML, thereby instructing compliant search engines not to include the page in search results and reducing the likelihood that affected consumers would find it through an ordinary Internet search. IDScan issued no separate press release or other affirmative public announcement directing affected consumers to the notice. The notice stated that the affected information "may include full names and driver's license or other government-issued identification numbers," but did not disclose that photographic

---

[129] Fla. Stat. § 501.171(4)(a), (6)(a).

[130] 815 Ill. Comp. Stat. 530/10(a)–(b).

[131] *See* Planet 13 Holdings Inc., Investor Relations, Newsroom—Press Releases, https://investors.planet13.com/newsroom/press-releases/default.aspx; Planet 13 Holdings Inc., Investor Relations, SEC Filings, https://investors.planet13.com/financials/sec-filings/default.aspx (last visited Sept. 22, 2026).

images of the identification documents—including visible-light, ultraviolet, and infrared images—may have been accessed or copied.[132]

146. The absence of notice compounds the harm. Individuals who do not know that their identification documents have been compromised cannot timely take available protective measures, including reviewing and freezing their credit, monitoring financial accounts, alerting financial institutions, reporting suspected identity theft, and contacting the issuing agency concerning replacement of the compromised credential.

**P. Plaintiff's Experience**

147. Plaintiff Aleksander Djordjevic is a natural person and a citizen of the State of Florida, residing in Orange County, Florida.

148. On or about December 20, 2025, Plaintiff Djordjevic purchased cannabis products from Planet 13 at the Planet 13 dispensary at 4850 W. Sunset Rd. in Las Vegas, Nevada. As a condition of that transaction, Planet 13 required Plaintiff to present his Florida driver's license, and a Planet 13 employee scanned that document in a device at the check-in station prior to entry. Plaintiff could not enter or purchase without presenting it.

149. Plaintiff Djordjevic believed that Defendants had implemented and maintained reasonable security to protect the identification document and the information contained in it.

150. At the time of the Data Breach, Defendants maintained Plaintiff Djordjevic's identification document, or the information and images derived from it, in their systems.

151. Plaintiff Djordjevic learned of the Data Breach from counsel on or about September 14, 2026. Planet 13 has never notified Plaintiff of the Data Breach.

152. Plaintiff Djordjevic is alarmed by the breadth of what was taken — not a password or a card number, but photographic images of a government-issued identification document captured under three light spectra — and by the fact that no Defendant has informed him of what happened.

---

[132] *See* IDScan.net, Notification of Data Security Incident, *supra* note 13.

153. Plaintiff Djordjevic would not have presented the identification document and would not have entered the dispensary or made the purchase, had Plaintiff known that the document would be photographed, transmitted to a third party's cloud, retained indefinitely and inadequately secured.

154. Plaintiff Djordjevic's Private Information has already been misused. For instance, Plaintiff Djordjevic has experienced an increase in spam, phishing attempts, and robocalls since the beginning of September 2026.

155. Plaintiff Djordjevic has suffered actual injury as a result of the Data Breach, including: (i) theft of Private Information; (ii) the lost or diminished value of that Private Information; (iii) the loss of time reasonably incurred in responding to the Data Breach; and (iv) loss of privacy.

156. The Data Breach has caused Plaintiff Djordjevic to suffer worry, anxiety, and stress, compounded by Defendants' failure to inform Plaintiff of the Data Breach or of its scope.

157. The Data Breach has also caused Plaintiff Djordjevic imminent and impending injury arising from the substantially increased risk of fraud and identity theft that follows from photographic images of his identification document having been offered for sale on a criminal marketplace.

158. Plaintiff Djordjevic anticipates spending considerable additional time and resources on an ongoing basis to mitigate and address the consequences of the Data Breach.

159. Plaintiff Djordjevic has a continuing interest in ensuring that the identification document and images that, on information and belief, remain in Defendants' possession are protected and safeguarded from further breach.

### Q. Plaintiff and Class Members Have Been Injured, and Defendants Have Done Nothing to Compensate Them

160. To date, Defendants have done nothing to compensate Plaintiff and Class Members for the damages they sustained in the Data Breach. Planet 13 has not offered them credit monitoring or identity restoration services of any kind.

161. Plaintiff and Class Members have suffered injury including: (a) theft of their Private Information; (b) the loss of the benefit of the bargain, in that the price they paid included the cost of the data security Planet 13 represented it was providing and did not provide; (c) the diminution in value of their Private Information; (d) lost time and out-of-pocket expense incurred in responding to the Data Breach; (e) loss of privacy, including the disclosure of their status as customers of a cannabis dispensary; and (f) a continuing and imminent risk of identity theft and fraud.

162. Plaintiff and Class Members have suffered or will suffer ascertainable losses in the form of out-of-pocket expenses and the value of time reasonably incurred in remedying or mitigating the effects of the Data Breach, including:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft protection;

d. Placing freezes and fraud alerts with the credit reporting agencies;

e. Contacting financial institutions and closing or modifying financial accounts;

f. Spending time on the telephone with, or in person at, financial institutions to dispute fraudulent charges;

g. Resetting automatic billing and payment instructions;

h. Paying late fees and declined payment fees imposed as a result of failed automatic payments tied to canceled cards;

i. Applying and paying for replacement identification documents; and

j. Closely reviewing and monitoring financial accounts and credit reports for unauthorized activity for years to come.

163. Those steps cost significant time and money. The Government Accountability Office has recognized that victims of identity theft face substantial costs and time to repair the damage to their name and credit record, and the Federal Trade Commission recommends that victims place fraud alerts, obtain and review credit reports, and monitor their accounts on a

continuing basis.[133] The Government Accountability Office has also observed that "large amounts of personal information are outside of consumers' control and bad actors can use stolen information for years after a breach," and that identity theft services "do not prevent fraud from happening in the first place."[134]

164. Defendants' delay in identifying and disclosing the Data Breach has aggravated the harm. In a data breach, early notice allows victims to take proactive steps to protect themselves. The longer victims' information circulates unannounced, the more harm that can be done.

165. Plaintiff and Class Members are entitled to injunctive relief. Defendants retain the identification documents of hundreds of thousands of individuals. On information and belief, Defendants have not remediated the vulnerability that permitted the exfiltration, and the documents remain at risk.

166. Plaintiff and Class Members have Article III standing to pursue each claim alleged herein. The Ninth Circuit has held that the theft of personal information, standing alone, creates a credible threat of real and immediate harm sufficient to confer standing, and that a substantial risk of identity theft or fraud is independently sufficient even without allegations of actual misuse. *See Krottner v. Starbucks Corp., 628 F.3d 1139, 1142–43 (9th Cir. 2010)*; *In re Zappos.com, Inc., Customer Data Sec. Breach Litig., 888 F.3d 1020, 1027–29 (9th Cir. 2018)*; *see also Healy v. Milliman, Inc.*, 164 F.4th 701, 706 (9th Cir. 2026) (reaffirming that "Article III's requirements are satisfied before a class is certified as long as at least one named plaintiff has standing," citing 888 F.3d at 1028 n.11, while holding that unnamed class members must demonstrate standing at summary judgment). This case presents a stronger showing than either: Plaintiff and Class Members' identification documents were not merely exposed to a risk of misuse — they were cataloged, priced and offered for sale on a criminal marketplace, and IDScan has confirmed that

---

[133] *See* U.S. Gov't Accountability Office, GAO-07-737, *supra* note 119, at 1; Fed. Trade Comm'n, What To Know About Identity Theft, *supra* note 118.

[134] *See* U.S. Gov't Accountability Office, GAO-19-230, *supra* note 64.

access to that information required payment. Plaintiff has suffered an injury in fact that is concrete, particularized, and actual or imminent; that injury was likely caused by Defendants; and it would likely be redressed by the relief sought. *See TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021)*. The Supreme Court expressly declined to address "whether every class member must demonstrate standing before a court certifies a class." *Id.* at 431 n.4.

## CLASS ACTION ALLEGATIONS

167. Plaintiff brings this action individually and on behalf of all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

168. Plaintiff seeks certification of the following nationwide class:

**Nationwide Class:** All persons in the United States who presented a government-issued identification document at a Planet 13 dispensary and whose identification document, or the information contained in it, was scanned using technology supplied by IDScan.net, Inc. during the Class Period.

169. Plaintiff also seeks certification of the following subclass:

**Nevada Subclass:** All members of the Nationwide Class who presented their identification document at a Planet 13 dispensary located in the State of Nevada.

170. Excluded from the Class and Subclass are Defendants, their subsidiaries and affiliates, their officers and directors, any entity in which a Defendant has a controlling interest, the legal representatives, heirs, successors and assigns of any excluded party, the judicial officers to whom this action is assigned and the members of their immediate families, and all persons who timely and validly elect to be excluded.

171. These definitions are based on the information available to Plaintiff at this time. Plaintiff may modify or refine them in an amended pleading or on a motion for class certification to account for facts learned in discovery, including which Planet 13 locations deployed IDScan's technology, over what period, and the scope of the Data Breach.

172. The "Class Period" runs from the date on which IDScan's identity scanning technology was first placed into use at any Planet 13 dispensary or in any Planet 13 system, through the present. Planet 13 and IDScan publicly described the deployment of that technology at Planet

13's Las Vegas SuperStore on August 4, 2022, but the date of first use at any location is a matter within Defendants' knowledge and is not established on the public record. IDScan's default configuration collects all records and deletes none. The identification documents of every person scanned from the commencement of that deployment therefore remained in IDScan's cloud when the exfiltration occurred.

173. Nevada substantive law governs the common-law claims of all Class Members regardless of their State of residence. Planet 13 is a Nevada corporation with its principal place of business in Nevada; the decision to photograph every customer's identification document, the decision to retain the images indefinitely, the selection of IDScan as the vendor, the configuration of the retention settings and the decision to exploit the resulting data for marketing were all made in Nevada; and the conduct giving rise to the claims was centered in Nevada.

174. The Nevada consumer fraud statute, NRS 41.600, may be applied on a nationwide basis for the same reason: Planet 13's unlawful conduct was centered in Nevada.

175. **Numerosity.** The Class comprises, on information and belief, hundreds of thousands of individuals. Planet 13 states that its Las Vegas SuperStore alone has the capacity to serve between 3,000 and 5,000 customers per day and that it maintains a customer-loyalty database of over 485,000 customers.[135] Joinder of all members is impracticable, and their identities are ascertainable from Defendants' own records.

176. **Commonality.** This action presents questions of law and fact common to the Class, including: whether Defendants photographed and retained Class Members' identification documents; whether they did so beyond what Nevada law required or authorized; whether Defendants owed a duty to safeguard those documents; whether Defendants' security measures were reasonable; whether the contract between Defendants contained the security provision NRS 603A.210(3) requires; whether the Data Breach occurred and its scope; whether Defendants failed to detect it in a timely manner; whether Defendants failed to give timely notice; whether

[135] *See* Planet 13 Holdings Inc., Annual Report (Form 10-K), *supra* note 15 (Items 1 and 2).

Defendants were unjustly enriched; and whether Class Members are entitled to damages, restitution and injunctive relief.

177. **Typicality.** Plaintiff's claims are typical of those of the Class. Plaintiff and each Class Member presented an identification document at a Planet 13 dispensary, had it scanned using IDScan's technology, and had it compromised in the same Data Breach.

178. **Adequacy.** Plaintiff will fairly and adequately represent the Class, has no interest antagonistic to or in conflict with the Class, and has retained counsel experienced in complex class action and data privacy litigation.

179. **Predominance and superiority.** Common questions predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members are small relative to the expense and burden of individual litigation. Class treatment presents no unusual difficulties of management.

180. **Injunctive relief.** Defendants have acted and refused to act on grounds generally applicable to the Class, making final injunctive and declaratory relief appropriate as to the Class as a whole under Rule 23(b)(2). Particular issues are also appropriate for certification under Rule 23(c)(4).

## CAUSES OF ACTION

## COUNT I

## NEGLIGENCE

## (On behalf of Plaintiff and the Nationwide Class, against all Defendants)

181. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 180 as if fully set forth herein.

182. Each Defendant collected, maintained and controlled digital images of the identification documents and the Private Information of Plaintiff and Class Members, and each owed them a duty to exercise reasonable care in doing so. Planet 13 collected the documents itself, at its own check-in stations, on scanning hardware it selected and installed, from customers it required to present them and permit them to be scanned as a condition of entry; it maintained the resulting images and the data parsed from those images in its own customer-loyalty database; and it controlled what was captured, how long it was kept, and to whom it was transmitted. IDScan collected the images and Private Information through the software it supplied and operated, maintained the images in the cloud repository it owned and administered, and controlled the retention settings under which they were kept.

183. Once Plaintiff and Class Members provided their identification information, they lacked the ability to control how Defendants stored, secured, transmitted, or retained it and necessarily depended on Defendants to protect it.

184. Defendants' duty arose from Defendants' undertaking to collect and hold the identification images and Private Information; from substantial and readily foreseeable risk of harm that unauthorized disclosure would cause; from Defendants' exclusive control over the systems in which the information was held; from the relationship created when Planet 13 required its customers to surrender the documents as a condition of entering and transacting; and, as to the persons and information within their scope, from the duties and standards imposed by NRS Chapter 603A.

185. Defendants knew that identification images and the information contained in them were highly sensitive, useful for identity theft and fraud, and attractive targets for cybercriminals.

186. Nevada imposes specific data-security duties by statute. NRS 603A.210(1) requires a data collector that maintains records containing the personal information of a Nevada resident to implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification or disclosure; and NRS 603A.210(3) requires a contract for the disclosure of a Nevada resident's personal information to include a provision requiring the recipient to implement and maintain reasonable security measures; and NRS

603A.200 requires reasonable measures to ensure the destruction of such records when they are no longer maintained.

187. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair practices in or affecting commerce, including a business's failure to employ reasonable measures to protect the personal information it collects, is pleaded as further evidence of the standard of care applicable to Defendants rather than as an independent statutory predicate. Applicable industry standards likewise inform the reasonable care required under the circumstances.

188. Plaintiff and Class Members were foreseeable victims of Defendants' failure to exercise reasonable care in collecting, maintaining, and controlling their identification information. Plaintiff and Class Members are also within the class of persons NRS 603A.200 was intended to protect, and the unauthorized acquisition and disclosure alleged here are among the harms that statute was intended to prevent.

189. As to records of Plaintiff and Class Members, Planet 13 and IDScan violated NRS 603A.200 by failing to timely destroy records containing their Personal Information.

190. As to records containing the personal information of Nevada residents, Planet 13 and IDScan violated NRS 603A.210(1) by failing to implement and maintain reasonable security measures. Planet 13 further violated NRS 603A.210(3) by failing to include the required security provision in its contract for the disclosure of that information to IDScan. To the extent Nevada's negligence-per-se doctrine applies, those statutory violations establish the duty and breach elements of this negligence claim as to the persons protected by the statutes. Independently, the statutory requirements and industry standards are evidence of the reasonable care required of Defendants under the circumstances.

191. Upon discovering the Data Breach, Defendants further owed a duty to act reasonably and to comply with applicable breach-notification requirements. That duty required Defendants to avoid unreasonable delay that would foreseeably prevent affected persons from taking timely protective measures and thereby cause distinct, incremental harm.

192. Defendants breached those duties by, among other things: capturing and retaining photographic images of identification documents beyond what the authorized purpose of verifying age required; retaining those images after that purpose had been satisfied; failing to encrypt or otherwise protect them; failing to enforce the contractual security provision required by NRS 603A.210(3); failing to monitor for and detect a continuing exfiltration over a period exceeding one year; and failing to give timely and adequate notice.

193. Each breach led to the next, and together they caused the injuries alleged above. Because Planet 13 captured photographic images of each document rather than reading the age from it, an image existed that was capable of being stolen. Because Planet 13 configured retention so that no record was ever deleted, that image was still in existence more than three years later. Because the images were transmitted to and held in IDScan's cloud rather than on Planet 13's own systems, they sat in a single repository holding the documents of millions of people. Because no contractual security provision was included or enforced, no obligation constrained how IDScan kept them. Because neither Defendant monitored for anomalous transfers, the removal continued undetected for more than a year. And because the images were captured under three light spectra to prove authenticity, what was taken was not a list of names but a reproducible facsimile of the document itself — which is why the records were saleable, were cataloged and priced, and were offered on the Nexus marketplace. Had any one of those failures not occurred, the documents of Plaintiff and Class Members would not have been compromised and offered for sale.

194. Defendants' conduct was grossly negligent. Their conduct constituted an extreme departure from the care reasonably required under the circumstances and a failure to exercise even slight care in material respects. Despite knowing the sensitivity, permanence, and criminal value of the information, Defendants concentrated, in a single cloud repository, photographic images of the identity documents of millions of individuals, captured under three light spectra for the express purpose of proving authenticity, and permitted their continuous removal for more than a year without detecting it.

195. As a direct and proximate result, Plaintiff and Class Members have suffered and will continue to suffer damages, including, lost time, loss of privacy and control over their

identities, the diminution in value of their Private Information, actual misuse and attempted misuse, economically valuable time reasonably spent responding to and mitigating the Data Breach, and the cost of measures reasonably necessary to mitigate the substantial and continuing risk of identity theft. Plaintiff and Class Members seek compensatory damages and all other relief available at law.

**COUNT II**

**BREACH OF IMPLIED CONTRACT**

**(On behalf of Plaintiff and the Nationwide Class, against Defendant Planet 13 Holdings)**

196. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 180 as if fully set forth herein.

197. Planet 13 offered Plaintiff and Class Members access to its premises and the opportunity to purchase its goods, but conditioned their entry and transactions on the presentation and scanning of government-issued identification documents containing sensitive Private Information. Plaintiff and Class Members presented and scanned such documents as requested.

198. Through such conduct, Plaintiff, Class Members, and Planet 13 objectively manifested mutual assent to ascertainable implied contracts. Under those contracts, Planet 13 agreed, at a minimum, to employ reasonable measures to safeguard the confidentiality and security of the Private Information it required customers to provide and to take reasonable measures to protect that information when transmitting it to or permitting it to be maintained by a service provider.

199. Plaintiff and Class Members accepted Planet 13's offer by entering its premises, completing transactions with it, paying for the goods and attendant services they received, and permitting Planet 13 to scan and obtain digital images of their identification documents and the Private Information contained in them.

200. The implied contracts were supported by consideration. Plaintiff and Class Members would not have provided their identification documents absent those implied promises. Planet 13 obtained substantial regulatory, operational, and commercial benefits from that

information, including using it to verify eligibility, control access to its premises, identify and exclude particular patrons across its stores, analyze its customers, and support its marketing activities.

201. Reasonable data security was a material component of the parties' exchange. Plaintiff and Class Members would not have provided Planet 13 with digital images of their identification documents or completed transactions with Planet 13 absent the understanding that Planet 13 would take reasonable measures to maintain the confidentiality and security of that information. A portion of the consideration paid to Planet 13 was attributable to the reasonable data security Planet 13 represented and impliedly agreed to provide.

202. Plaintiff and Class Members performed their obligations under the implied contracts by providing the required identification information and paying Planet 13 in connection with their transactions.

203. Planet 13 breached the implied contracts by failing to employ reasonable measures to safeguard Plaintiff's and Class Members' documents, including by transmitting and permitting the information to be retained by its vendor without ensuring that the information was subject to reasonable and adequate safeguards.

204. Had Plaintiff and Class Members known that Planet 13 would not provide the represented and agreed-upon data security, they would not have provided their identification information, would not have completed transactions with Planet 13, or would not have paid the same amount for those transactions.

205. Planet 13's breaches directly and foreseeably caused Plaintiff and Class Members to lose the benefit of their bargain and to receive transactions worth less than the consideration they provided.

206. As a direct and proximate result, Plaintiff and Class Members suffered damages, including the loss of the benefit of the bargain and the injuries alleged above. Plaintiff and Class Members are entitled to recover compensatory and consequential damages resulting from Planet 13's breaches, in an amount to be determined at trial, together with all other relief permitted by law.

## COUNT III

## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT

## (On behalf of Plaintiff and the Nationwide Class, against Defendant IDScan.net)

207. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 180 as if fully set forth herein.

208. IDScan supplied the identity scanning system described above to Planet 13. Planet 13 placed IDScan's scanners at the check-in stations of its dispensaries, and IDScan ran the cloud service into which those scanners uploaded and stored the identification documents they captured.

209. The two companies announced their business relationship publicly, in a joint press release, describing Planet 13 as IDScan's partner. Planet 13 has also told its investors that it thoroughly assesses every third-party provider before hiring it and monitors it on an ongoing basis. On information and belief, the two companies entered into one or more written agreements that govern how IDScan collects, handles, and keeps the identification documents at issue.

210. Nevada law required those agreements to contain a security provision. NRS 603A.040 defines personal information as the combination of a person's first and last name and "[d]river's license number, driver authorization card number or identification card number." NRS 603A.210(3) provides that a contract for the disclosure of the personal information of a Nevada resident "must include a provision requiring the person to whom the information is disclosed to implement and maintain reasonable security measures" to protect such information from "unauthorized access, acquisition, destruction, use, modification or disclosure."[136]

211. Illinois imposes a substantially similar requirement. Under the Illinois Personal Information Protection Act, a data collector that owns or licenses, or merely maintains or stores, records containing an Illinois resident's personal information must implement and maintain reasonable security measures protecting those records. A contract for the disclosure of such

[136] Nev. Rev. Stat. § 603A.210(3).

information must also require the recipient to implement and maintain reasonable security measures protecting the records from unauthorized access, acquisition, destruction, use, modification, or disclosure.[137]

212. Planet 13 operates in Illinois as well as Nevada. Accordingly, to comply with Illinois and Nevada law, the agreements between Planet 13 and IDScan were required to obligate IDScan to implement and maintain reasonable security measures protecting the personal information of Planet 13 customers whose identification documents Planet 13 disclosed to IDScan.

213. On information and belief, to ensure compliance with Illinois and Nevada law, the agreements imposed uniform security obligations on all identification documents and personal information disclosed to IDScan through the scanning system—without limiting those obligations according to the residency of the person whose information was disclosed. The system collected, transmitted, processed, and stored the same categories of information in the same manner regardless of residency, and the security measures required by the agreements applied to the records maintained within that system as a whole.

214. The direct purpose of such contractual security provisions was to protect the persons whose personal information Planet 13 disclosed to IDScan. When entering into the agreements, Planet 13 and IDScan knew that IDScan would receive and maintain customers' identification documents and that a failure to perform the promised security obligations would expose those customers to the precise risks the provisions were intended to prevent. Plaintiff and Class Members were therefore the direct and intended beneficiaries of those provisions, rather than merely incidental beneficiaries.

215. It was also foreseeable to Planet 13 and IDScan that customers would provide their identification documents in reliance on Planet 13 and its service providers safeguarding the information contained in those documents. Plaintiff and Class Members entrusted their identification documents to Planet 13 with the reasonable expectation that Planet 13 and the service

---

[137] 815 Ill. Comp. Stat. 530/5, 530/45(a)–(b).

providers it selected would protect that information from unauthorized access, acquisition, use, and disclosure.

216. IDScan breached those provisions by failing to implement and maintain reasonable data security measures, by retaining identification documents and images longer than necessary, and by failing to detect and stop their exfiltration over a prolonged period.

217. As a direct and proximate result, Plaintiff and Class Members suffered the damages alleged above.

## COUNT IV

## UNJUST ENRICHMENT

## (On behalf of Plaintiff and the Nationwide Class, against Defendant Planet 13 Holdings)

218. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 180 as if fully set forth herein.

219. Plaintiff pleads this claim in the alternative to any claim based on an express or implied contract and to the extent that no enforceable contract governs Planet 13's receipt, use, retention, and protection of Plaintiff's and Class Members' Private Information. Plaintiff does not seek duplicative recovery.

220. Plaintiff and Class Members conferred substantial benefits on Planet 13. They paid Planet 13 for cannabis products and provided Planet 13 access to their identification documents and the valuable personal information contained in them. Planet 13 required customers to present that information as a condition of entering its premises and completing transactions with it.

221. The Private Information conferred an independent commercial and operational benefit on Planet 13. Among other things, it enabled Planet 13 to satisfy regulatory requirements, control access to its premises, identify and exclude particular patrons across its stores, analyze its customers, and support its marketing and other business activities.

222. Planet 13 knew of, appreciated, and voluntarily accepted the benefits conferred by Plaintiff and Class Members. Planet 13 retained their payments and obtained possession, control, and use of their Private Information. As Planet 13's vendor explained, the system also enabled

Planet 13 to "harvest the names and demographic/geographic information of its guests" and obtain "insights into customer profiles."[138]

223. Planet 13 retained that benefit while failing to provide the data security that was its consideration. It would be inequitable for it to do so. Plaintiff and Class Members are entitled to restitution and to disgorgement of the amounts by which Planet 13 was unjustly enriched.

224. Planet 13 obtained and retained those benefits under inequitable circumstances. It failed to disclose the material facts alleged above concerning the collection, transmission, retention, use, and security of customers' identification information, while representing that the information would be kept confidential and secure. Had Plaintiff and Class Members known the truth, they would not have entered into the transactions, would not have provided their identification information, or would not have paid the same amount.

225. Planet 13 nevertheless retained Plaintiff's and Class Members' payments and the operational and commercial benefits derived from their Private Information while failing to provide the reasonable data security that formed part of the exchange. By failing to make the expenditures reasonably necessary to protect that information, Planet 13 retained for itself funds that should have been used to provide the represented security and increased its profits at the expense of Plaintiff and Class Members.

226. Planet 13's failure to provide the represented security permitted Plaintiff's and Class Members' Private Information to be accessed, copied, catalogued, and offered for sale by unauthorized persons. Planet 13 has not returned the value it obtained from that information or restored Plaintiff and Class Members to the position they occupied before entrusting it to Planet 13.

227. Plaintiff and Class Members lack an adequate remedy at law to the extent Planet 13 continues to possess, use, or derive value from their Private Information, and because legal damages cannot require the return or deletion of that information or fully account for the benefits

---

[138] *See* Press Release, IDScan.net, *supra* note 6.

Planet 13 obtained through its use of the information and its avoidance of reasonable security expenditures. The restitution sought here is measured by Planet 13's unjust gain and is distinct from compensatory damages sought for Plaintiff's and Class Members' losses.

228. Under principles of equity and good conscience, Planet 13 should not be permitted to retain the benefits obtained from Plaintiff and Class Members without providing the reasonable data security that formed part of the exchange.

229. Plaintiff and Class Members are therefore entitled to restitution of the portion of their payments attributable to reasonable data security, restitution of the value Planet 13 obtained from their Private Information, disgorgement of gains traceable to the challenged conduct, and such other equitable relief as the Court deems appropriate.

## <u>COUNT V</u>

## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NRS 41.600

## (On behalf of Plaintiff and the Nationwide Class, or in the alternative, the Nevada Subclass, against Defendant Planet 13 Holdings)

230. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 180 as if fully set forth herein.

231. NRS 41.600(1) provides that "[a]n action may be brought by any person who is a victim of consumer fraud." NRS 41.600(2)(e) defines "consumer fraud" to include "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."[139]

232. Further, NRS 603A.260 provides that "[a] violation of the provisions of NRS 603A.010 to 603A.290, inclusive, constitutes a deceptive trade practice for the purposes of NRS 598.0903 to 598.0999, inclusive."

---

[139] Nev. Rev. Stat. § 41.600.

233. As to records of Plaintiff and Class Members, Planet 13 violated NRS 603A.200 by failing to timely destroy records containing their Personal Information.

234. As to records containing the personal information of Nevada residents, Planet 13 violated NRS 603A.210(1) by failing to implement and maintain reasonable security measures. Planet 13 further violated NRS 603A.210(3) by failing to include the required security provision in its contract for the disclosure of that information to IDScan.

235. Planet 13 engaged in the challenged conduct in the course of its business in the State of Nevada; specifically, Planet 13 offered cannabis products and the services attendant to entering and transacting at its Nevada premises.

236. Additionally, Planet 13 engaged in deceptive trade practices within the meaning of NRS 598.0923(1)(b) by knowingly failing to disclose material facts in connection with the sale of goods and services when, on December 20, 2025, Plaintiff entered its facility at 4850 W. Sunset Rd., Las Vegas, Nevada to purchase Planet 13's products. Before requiring Plaintiff to present their identification and before completing their transactions that day, Planet 13 failed to disclose, among other things:

a. that Planet 13 would not merely inspect or electronically verify the identification document, but would capture and retain complete images under three light spectra;

b. that the images and information parsed from them would be transmitted to and maintained in a cloud repository administered by IDScan;

c. that the images would be retained for years or under settings through which no records were routinely deleted;

d. that the information would be combined with, used for, or made available for customer profiling, demographic analysis, geographic analysis, marketing, or customer-loyalty purposes;

e. that neither Planet 13 nor IDScan had implemented security measures reasonably commensurate with the sensitivity and value of the information; and

f. that concentrating complete identification images in the cloud repository exposed Plaintiff and Class Members to risks materially different from those associated with briefly inspecting an identification document to verify age.

237. These facts were material. A reasonable consumer would attach importance to whether a merchant would merely inspect an identification document or instead create, transmit, analyze, and retain a reproducible image of it for years. A reasonable consumer would likewise attach importance to the identity of the entity holding the image, the purposes for which it would be used, the duration of retention, and the security measures protecting it.

238. Planet 13 acted knowingly because it was aware of the facts constituting its omissions. Planet 13 selected and installed the scanning system; determined what customers were required to present; knew or controlled the purposes for which the resulting information was used; knew that the information was transmitted to IDScan; and established, approved, or continued the applicable retention practices. Planet 13 therefore knew the material collection, use, retention, and security facts it did not disclose.

239. Planet 13's representations and omissions were directly connected to the resulting harm. Had Planet 13 truthfully disclosed the nature, purposes, duration, and security of the collection, Plaintiff and Class Members would not have permitted their identification documents to be scanned, would not have entered or completed the transactions, would have selected an available alternative that did not require the same collection, or would have paid less.

240. As a direct and proximate result, Plaintiff and Class Members sustained damages, including, as applicable and as specifically alleged above:

a. loss of the benefit of the bargain and overpayment, because a portion of the consideration paid in the transactions was attributable to the secure and confidential transaction Planet 13 represented they would provide, but the goods and services received were worth less because that promised security and confidentiality were not provided; and

b. diminution in the value of and loss of control over their Private Information.

241. Unauthorized acquisition destroyed the secrecy and exclusivity that gave the information part of its value and utility to its owners. Plaintiff and Class Members cannot retrieve

the images from the persons who acquired them, prevent their duplication or resale, or restore their prior confidentiality. Reissuance of a physical credential does not retrieve the compromised image, erase the personal information depicted on it, or eliminate the continuing risk created by copies already in circulation.

242. The value of the goods and services Plaintiff and Class Members received was therefore less than the value for which they paid.

243. Plaintiff and Class Members have also been impaired in their own ability to participate in that market. Plaintiff and Class Members cannot withdraw their documents from the Nexus marketplace, cannot prevent their further resale, and cannot restore the exclusivity on which that value depends; and unlike a payment card, a driver's license cannot be canceled and reissued under new identifiers.

244. Planet 13 continues to retain Plaintiff's and Class Members' Private Information and have not established that all compromised copies have been recovered or destroyed. Plaintiff and Class Members therefore remain exposed to continuing misuse and to further unauthorized access resulting from the challenged retention and security practices.

245. Plaintiff and Class Members are entitled under NRS 41.600(3) to their damages, to equitable relief, and to their costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class and Subclass, respectfully requests that this Court enter judgment against Defendants and award the following relief:

A. Certifying this action as a class action under Rule 23, appointing Plaintiff as class representative, and appointing the undersigned as class counsel;

B. Enjoining Defendants from further unlawful conduct and requiring them to implement and maintain reasonable data security measures;

C. Awarding actual, compensatory, statutory, and nominal damages in amounts to be determined at trial;

D. Awarding restitution and disgorgement of the amounts by which Defendants were unjustly enriched;

E. Awarding costs and reasonable attorneys' fees;

F. Awarding pre-judgment and post-judgment interest on any amounts awarded; and

G. Granting such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 24, 2026

*/s/ Martin A. Muckleroy*
**MUCKLEROY LUNT, LLC**
Martin A. Muckleroy, Esq.
Nevada Bar No.: 009634
6077 S. Fort Apache Rd., Ste. 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Fax: (702) 938-4065
martin@muckleroylunt.com

Todd McClelland*
Jennifer S. Czeisler*
Edward W. Ciolko*
Christopher Hurld*
**STERLINGTON, PLLC**
228 Park Avenue South, Suite 97956,
New York, New York 10003
Tel.: (212) 433-2993
todd.mcclelland@sterlingtonlaw.com
jen.czeisler@sterlingtonlaw.com
edward.ciolko@sterlingtonlaw.com
christopher.hurld@sterlingtonlaw.com

*Attorneys for Plaintiff*
*and the Proposed Class*

*Pro Hac Vice Forthcoming